841 So.2d 349 (2002)
Ray Lamar JOHNSTON, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-979.
Supreme Court of Florida.
December 5, 2002.
Rehearing Denied March 13, 2003.
*351 James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Richard E. Doran, Attorney General, and Kimberly Nolen Hopkins, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Ray Lamar Johnston appeals his convictions of first-degree murder, kidnapping, robbery, sexual battery, and burglary of a conveyance with assault or battery, and his respective sentences, including the sentence of death which was imposed for the crime of murder. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the following reasons, we affirm his convictions and sentences.

FACTS
Leanne Coryell, a clinical orthodontic assistant for Dr. Gregory Dyer, went to work at 1 p.m. on August 19, 1997. At approximately 8:15 p.m., Dr. Dyer went home, leaving Melissa Hill and Coryell to close the office. Coryell clocked out at 8:38 and, after some difficulty setting the office's alarm, left within the next ten minutes. Coryell picked up groceries at Publix Super Market where the store's surveillance cameras documented her checking out at 9:23. She was not seen alive again.
Ray Johnston, Gary Senchak, and Margaret Vasquez shared a three-bedroom apartment at the Landings Apartment Complexthe same apartment complex in which Coryell lived. On the evening that Coryell was murdered, Johnston argued with his roommates over the utility bills and left the apartment between 8:30 and 9:30 p.m. Vasquez noted that around 9:45, Johnston's car[1] was still in the parking lot although Johnston had not returned. Sometime after 10:00, Johnston came back to the apartment and threw $60 at Senchak, telling him, "That's all you're getting from me, you son-of-a-bitch."
Coryell's body was discovered around 10:30 p.m. on the evening of August 19 by John Debnar, who was playing catch with his dogs in a field close to St. Timothy's Church. While there, he noticed that a car with an out-of-place headlight entered St. Timothy's property and stopped briefly beside an empty black car. When Debnar walked his dogs home, one of his dogs stopped at a pond on the church's property, causing Debnar to notice the body of a woman floating in the water.
*352 Hillsborough County sheriff's officers arrived at St. Timothy's Church shortly before 11:30 p.m. and found Coryell's body lying face down in the pond, completely nude. Her clothes were found on a nearby embankment. Dental stone impressions were taken of some shoe prints that were in the general area where the clothing was found. Coryell's empty black Infiniti was in the church's parking lot with the keys in the ignition and the engine still warm. Some, but not all, of her groceries were sitting in the back seat. Although the police were unable to lift any prints from the interior of the car, they did lift a fingerprint matching Johnston's from the exterior.
Dr. Russell Vega performed the autopsy and opined that the victim died sometime after 9 p.m. Based on the extensive bruising of the external and internal neck tissues, Dr. Vega concluded that the victim died from manual strangulation, as opposed to the use of a ligature. Dr. Vega also observed a laceration on the left side of the victim's lower lip and a laceration on her chin, both of which were caused by blunt impact. There were vertical scrapes on the victim's back which suggested that she was dragged to the pond. There were two unusually shaped bruises on Coryell's buttocks which were similar to the metal appliques on her belt, causing Dr. Vega to believe that she was hit with her own belt while still alive. Finally, the victim suffered both internal and external injuries to her vaginal area, injuries which were consistent with vaginal penetration. Her hand still clutched strands of grass.
In the late evening hours of August 19 and again early the next morning, the victim's ATM card was used to withdraw the $500 daily limit. The police used the ATM surveillance videos to capture pictures of the person who was using the victim's card, and these photographs were provided to the news media, which aired them. Juanita Walker, a friend of Johnston, saw the televised pictures and called the authorities, identifying Johnston as the person in the photos. She also told police that she and Christine Cisilski saw Johnston a little before 10 p.m. on the night of the crime, driving a black, mid-size car out of the Landings Apartment Complex.
Based on telephone calls identifying Johnston as the person in the photos, the police obtained a warrant to search his apartment and found a pair of wet tennis shoes and shorts. The imprints from the tennis shoes matched three partial impressions that were found at the scene of the crime. However, the shoes did not have any individual characteristics which would enable an expert to conclude that Johnston's shoes were the exact shoes which made the impressions.
Johnston saw his picture on television and volunteered to give a statement in which he initially told police that he was a friend of Coryell and that they had gone out to dinner a few times. He told Detective Walters that on the evening of the 19th, he had met Coryell at Malio's for drinks at 6:15 p.m. The pair then went to Carrabba's and left around 8:30 or 9:00. According to Johnston, the victim indicated that she needed to stop at a grocery store before she went home, but before they parted, the victim gave Johnston her ATM card and PIN so that he could withdraw $1200 in repayment of a loan she had obtained from him. When he arrived home, he changed, went jogging, and then withdrew $500 from her account. He withdrew another $500 the following day.
Johnston was placed under arrest for grand theft, was read his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and agreed to continue the interview. The detective confronted Johnston with the fact that Coryell *353 did not leave work until 8:38. Johnston's response was that other employees must have covered for her because he was with her at that time, but he was unable to provide the names of anybody who could corroborate this explanation. The detective then told Johnston that they had found his jogging shoes, which were completely wet. Johnston justified the wet shoes by claiming that he jumped into the hot tub, shoes and all, to wash off after his run. The detective asked several times whether Johnston was involved with Coryell's death and Johnston responded by saying that they would not find any DNA evidence, hair, or saliva which would link him to the victim.
In response to Johnston's contention that he loaned Coryell money, the State introduced several witnesses who testified that Johnston near the time of the murder did not have the financial ability to make a $1200 loan. The State also called Laurie Pickelsimer, the defendant's pen pal in prison, who testified that Johnston asked her to provide a false alibi for him. Johnston suggested that she tell his attorneys that on the night of the murder, she and Johnston were working out in the gym at the apartment complex from 9:00 until about 10:30, except for a short time when he walked back to his apartment to get them a drink for the hot tub. The jury found Johnston guilty of first-degree murder, kidnapping, robbery, sexual battery, and burglary of a conveyance with assault.
The penalty phase of the trial began on June 16, 1999. The State introduced testimony from three victims of prior violent felonies that Johnston had committed against total strangers. Susan Reeder was the first witness to testify and recalled how Johnston grabbed her when she was stepping out of her car, put a hunting knife to her throat, drove her to an isolated area, and then beat her with his belt and raped her. Julia Maynard recounted how Johnston broke into her home, and when she arrived, grabbed her, held a knife to her neck, and took her to her bedroom so he could take pictures of her in various states of dress and undress and touch her sexually. Carolyn Peak testified that in June 1988, while she was getting out of her car, Johnston put a knife to her throat, forced her back into the car, and tied her hands with an Ace Bandage. She escaped when a police officer pulled the car over because a head light was out.
Dr. Vega, the medical examiner who performed the autopsy on Coryell, opined that Coryell was conscious at the time she was beaten and received her vaginal injuries. He believed the last injury to the victim was manual strangulation and that she was likely conscious for up to two minutes while being strangled. Finally, the State introduced three witnesses to provide victim impact evidence: the victim's father, Thomas Morris; her employer, Dr. Dyer; and her pastor, Matthew Hartsfield.
Defense counsel introduced four experts to testify that Johnston had frontal lobe brain damage and mental health problems. Dr. Diana Pollack, a neurologist, treated Johnston a few months before the murder because Johnston suffered from blackouts, headaches, a tingling sensation down one side of his body, and spells of confusion. She administered various neurological tests, including an MRI and an EEG, but was unable to find any structural deficiencies in his brain.
Dr. Harry Krop, a clinical psychologist, testified that he performed a neuropsychological evaluation on Johnston. When Johnston performed poorly, Dr. Krop recommended that a PET scan be performed. Based on Johnston's documented history and further testing, he concluded that Johnston suffered from a frontal lobe impairment *354 and that this problem has three main manifestations: (1) difficulty starting an action; (2) difficulty stopping an existing action; and (3) being too impulsive or acting without thinking.
Dr. Frank Wood, a neuropsychologist, examined Johnston and reviewed the results of his PET scan. He concluded that Johnston's frontal lobe area had substantially less activity than was normal (below the first percentile) and that this deficiency correlates with poor judgment, impulsivity, and "disinhibited" behavior. Based on Johnston's medical and behavioral record, Dr. Wood concluded that this was a chronic condition.
Dr. Michael Maher, a physician and psychiatrist, evaluated Johnston and reviewed his history and medical records. Dr. Maher agreed that it was evident from the PET scan that Johnston suffered from impairments of the frontal lobe of his brain, making it extremely hard for him to resist any strong urges. He also believed that Johnston suffered from seizures that were related to his brain abnormality and had dissociative disorder (a psychiatric disorder in which some aspect of a person's total personality or awareness is unavailable at certain times).
Several character witnesses testified in Johnston's behalf. According to Gloria Myer, a placement specialist for a correctional institution, Johnston was dedicated to his job, very organized, and followed Myer's instructions. She also recalled a time when she thought he was having a stroke because "his whole side of his face had fallen, had drooped." John Walkup, Johnston's probation officer, recommended Johnston for early termination because he had a stable family life, worked at a steady job, reported regularly, paid his fees, and was doing fine. William Jordon, a case manager for the Department of Corrections, knew Johnston while he was in prison and asserted that he got along well with other inmates and was not a disciplinary problem. John Field, a chaplain with the Department of Corrections, knew Johnston when he was incarcerated in the early 1990s and declared that Johnston was one of the chapel's best clerks. Bruce Drennen, the president of the Brandon Chamber of Commerce, testified that Johnston was a designated representative of a company that was a member of the chamber.
Johnston's family provided mitigation. His mother, Sara James, testified that at the age of three or four, Johnston had fallen out of a car and hit his head on the curb, resulting in an injury which required stitches. Johnston did not perform well in school, and by the time he was in the seventh grade, he became disruptive in class and was sometimes sent home. Problems became more serious the older he grew, and eventually he was sent to the Hillcrest Institution for treatment. Normally, Johnston had a sweet disposition, but he could get explosive at times. Susan Bailey, Johnston's ex-wife, testified that while she was married to him, Johnston was the perfect husbandhe cooked, cleaned, and helped raise her two daughters. She described him as very tenderhearted, remembering how it would upset him if she had to paddle her girls for misbehaving. She also stated that even though he would occasionally snap over minor issues, he would not vent his anger towards his family. Rebecca Vineyard, Johnston's younger sister, stated that Johnston never acted normalhe would try too hard to make people love him and would go overboard trying to get positive responses. However, his personality could quickly change, and he did not like being rejected or humiliated.
Finally, Ray Johnston took the stand and admitted that he killed the victim. According to Johnston, he saw Coryell *355 drive in after he had just gotten out of the hot tub. He asked her if he could help carry her groceries to her apartment, but she ignored his request. Johnston stated that he just wanted her attention and meant to reach for her shoulders but grabbed her neck instead. He thought he held her for just a few seconds, but then her legs gave out. She hit her lip on the edge of the door, and her chin hit the ground, causing two lacerations on her face. When he rolled her over, he saw her eyes and mouth were open. He tried reviving her by giving CPR, but it had no effect. Thinking that he had broken her neck, Johnston put her in the back seat of her car and drove her to the church. To make it look like she had been assaulted, Johnston took off her clothes and scattered them out, kicked her in the crotch, beat her with her belt, and dragged her to the pond. A car drove into the parking lot, prompting Johnston to run home. After he took a shower, Johnston drove back to the church to see if anybody had discovered the body. While there, he found the victim's ATM card and its PIN, which was written on the cover of her address book. He took her ATM card and drove to Barnett Bank to withdraw some money. The next day, after Johnston learned his picture was being broadcast on the news, he turned himself in and made up the story that Coryell had given him the ATM card.
The jury unanimously recommended the death penalty. After holding a Spencer hearing,[2] the trial court found four aggravating factors,[3] one statutory mitigator,[4] and numerous nonstatutory mitigators, and followed the jury recommendation. Johnston raises four claims on appeal.

ANALYSIS
In his first claim, Johnston asserts that he is entitled to a new trial because juror Tracy Robinson (1) was under prosecution at the time of the trial; (2) withheld a material fact during voir dire; and (3) was abusing drugs during the trial. The record reveals that approximately ten months before Johnston's trial, Robinson pled nolo contendere to charges of obstructing a police officer without violence. The judge withheld adjudication and required her to pay court costs in the amount of $121. Robinson was notified in writing at the time of sentencing that if she could not pay the fine, she was required to appear in court on September 25, 1998, and was further informed that the failure to pay the fine or to go to court would result in her arrest. Robinson failed to timely pay the court fine and failed to appear in court as ordered, and on January 13, 1999, after several notices went unheeded, a capias was issued.
On June 7, 1999, Robinson appeared in court for jury selection in the instant case. On the juror questionnaire, Robinson indicated that either she or somebody close to her was previously accused of a crime. During voir dire, the prosecutor requested that she elaborate on her answer:
Mr. Pruner: These jury forms ask very broad questions and, of course, this is where we're getting into that area *356 where I'm not trying to embarrass anyone or intimidate anyone, but it asks, have you or any member of your family or any close friends ever been accused of a crime. That's what I want to go into now.
I want to ask who was the person, what relationship was it to you; if it wasn't you, whether you felt that that person, whether it was you or someone else, was treated fairly in the process, and whether you think that incident or experience would prevent you from being a fair and impartial juror.
Before I move on, did I miss anybody else about prior jury service, though?
[Prospective jurors indicating negatively.]
....
Mr. Pruner: Ms. Robinson, who was that person?
Ms. Robinson: My son's father.
Mr. Pruner: Okay. Did you follow along with that person's involvement in the criminal justice system, keep up with his case?
Ms. Robinson: Oh, yeah.
Mr. Pruner: Was this in Hillsborough?
Ms. Robinson: Uh-huh.
Mr. Pruner: Did you have an opinion whether that person was treated fairly or unfairly?
Ms. Robinson: It was fair.
Mr. Pruner: Is there anything about your knowledge of his experience that would prevent you from being a fair and impartial juror?
Ms. Robinson: No.
Mr. Pruner: Thank you.
Defense counsel did not question Robinson any further as to her response to this line of questioning, telling the potential jurors, "Since [the prosecutor has] already asked you many of [the] things I might have asked, I won't ask you to repeat yourself." Robinson never amended her answer and never mentioned that she pled nolo contendere in a criminal proceeding less than a year before signing the questionnaire form. She was selected as one of the jurors and became the forewoman of the jury that convicted Johnston of first-degree murder.
The penalty phase began on June 16, 1999, and after the first four witnesses testified, the jurors were sent home. Later that night, police arrested juror Robinson for possession of marijuana, crack cocaine, and a loaded firearm. The trial judge replaced juror Robinson with the remaining alternate juror,[5] and the jury subsequently recommended that Johnston be sentenced to death. Immediately after the jury recommended the death penalty, defense counsel filed a timely motion for new trial, which included the allegation that the trial judge erroneously replaced juror Robinson with an objectionable alternate juror. After defense counsel conducted an investigation of Robinson and discovered her prior criminal history, they amended the motion for new trial and raised two additional grounds: (1) that Robinson was under prosecution during the time she served as a juror; and (2) that Robinson could have been abusing drugs during the guilt phase proceedings. The trial court subsequently denied the motion.
Johnston asserts that he is entitled to a new trial because juror Robinson was under prosecution by the same office which was prosecuting Johnston. We disagree. Generally, a person is statutorily *357 disqualified from serving on the jury if he or she is under prosecution for a crime. § 40.013(1), Fla. Stat. (1999) ("No person who is under prosecution for any crime... shall be qualified to serve as a juror."). In this case, however, Robinson's criminal charges were resolved prior to jury selection and the only outstanding item was payment of the fine. Although she was threatened with arrest for the failure to pay the fine, it is undisputed that this involved civil contempt charges,[6] as opposed to criminal charges. Robinson did not commit a criminal offense when she failed to pay her fine[7] and, accordingly, was not statutorily disqualified from serving on the jury.
Johnston next asserts that he is entitled to a new trial because juror Robinson deliberately failed to disclose that she pled nolo contendere to a misdemeanor charge within the past year. Appellate counsel concedes that defense counsel failed to specifically raise this claim with the trial court. As this specific ground for a new trial was not raised with the lower court, it will not be considered on appeal.[8] To the extent that Johnston is claiming his counsel was ineffective, we find that this issue should be addressed in a rule 3.850 motionnot on direct appeal.[9]
Finally, the defendant asserts that he is entitled to a new trial, or at a minimum, a juror interview, to determine whether juror Robinson abused drugs during the guilt phase of the trial. Specifically, he contends that based on the addictive nature of crack cocaine and the timing of Robinson's arrest for drug possession, she may have been under the influence of illegal substances during the guilt phase. In order to be entitled to juror interviews, a party must present "sworn allegations that, if true, would require the court to order a new trial because the alleged error was so fundamental and prejudicial as to vitiate the entire proceedings." Johnson v. State, 804 So.2d 1218, 1225 (Fla.2001). In this case, Johnston is not entitled to relief because his request for an interview was based on mere speculation.[10] Johnston never alleged that any juror, party, or witness observed Robinson appearing to be intoxicated during the course of the trial, nor did anybody see Robinson abusing *358 drugs. Accordingly, the trial court did not err in its decision to deny the motion to interview Robinson.
Johnston's second claim raises the issue of whether he is entitled to a new trial based on the failure of the trial court and counsel to ascertain the extent of the exposure of eight prospective jurors (including two who served on the jury) to the inflammatory pretrial publicity which focused almost entirely on inadmissible material. The record reveals that both the television media and the newspapers closely followed the progress of the murder investigation and the criminal proceedings in the case. Media reports included numerous inadmissible details of Johnston's criminal history and early releases, his purported proclivities for violence against women, and statements from some of Johnston's own family that they believed Johnston was guilty and was "a ticking time bomb." Prior to the trial, the trial judge granted defense counsel's request to individually question prospective jurors at the bench relative to the jurors' prior knowledge about the case. Despite this ruling, however, defense counsel never asked to individually question the several jurors who indicated that they recalled hearing something about the case.
Johnston recognizes that defense counsel "dropped the ball" by not requesting individual voir dire for these jurors, but asserts that he is entitled to a new trial because the trial judge also had an independent obligation to address this issue, especially in light of the fact that defense counsel had initially alerted the court to the potential problem. This Court has never created an independent obligation on the part of the trial judge to question prospective jurors sua sponte, in the absence of a request by counsel. In fact, the Court has recognized that the trial court is not required to grant individual voir dire, even with a request by counsel. Specifically, this Court described the legal standard as follows:
[A] trial court has broad discretion in deciding whether prospective jurors must be questioned individually about publicity the case has received. Individual voir dire to determine juror impartiality in the face of pretrial publicity is constitutionally compelled only if the trial court's failure to ask these questions renders the trial fundamentally unfair. The mere existence of extensive pretrial publicity is not enough to raise a presumption of unfairness of constitutional magnitude. A prospective juror is presumed impartial if he or she can set aside a preformed opinion or impression and return a verdict based on evidence presented in court.
Bolin v. State, 736 So.2d 1160, 1164 (Fla. 1999) (citations omitted). We find that the trial court did not abuse its discretion by refusing to independently voir dire the jury and hence this claim is denied.
Alternatively, Johnston asserts he is entitled to a new trial because his trial counsel was ineffective for failing to individually question those jurors who had exposure to pretrial publicity. We deny this claim without prejudice because it should be raised in a postconviction motion, as opposed to direct appeal. See Teffeteller v. Dugger, 734 So.2d 1009, 1020 (Fla. 1999) (addressing this type of postconviction motion); Loren v. State, 601 So.2d 271, 272 (Fla. 1st DCA 1992) ("[C]laims of ineffective assistance of counsel are generally not reviewable on direct appeal, but are properly raised in a motion for postconviction relief").
In his third claim of error, Johnston contends that the trial court committed reversible error by failing to instruct the penalty phase jury on the mitigating factor of "extreme mental or emotional *359 disturbance at the time of the offense." The record reveals that during the penalty phase jury charge conference, defense counsel abandoned this mitigator:
The Court: What are you going to ask for?
Mr. Registrato: Mental health mitigators.
The Court: The statutory mental health mitigators?
Mr. Registrato: Yes, ma'am.
The Court: Who are you planning to call to establish them?
Mr. Registrato: Well, II mean, they may not have said the word, but I believe they've already been established.
The Court: Which they?
Mr. Registrato: Dr. Maher and Dr. Krop.
The Court: No, no, which statutory mitigators do you believe have been established?
Mr. Registrato: I would ask for the mitigator 7(b), the capital felony was committed while the defendant was under the influence of extreme or mental emotional disturbance, as well as 7(g), the defendant could not have reasonably foreseen his conduct in the course of the commission of the offense would cause wait a minute. That's not it, Judge. 7(e) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirement of law was substantially impaired.
The Court: Well, as to (b), the only evidence in this case that the crime was committed while the defendant was under the influence of mental or emotional disturbance is the testimony of Dr. Maher who said that at the time of the crime, he was in a mild dissociative having a mild dissociative episode triggered by the initial approach and rejection by the victim. I don't know how you can get extreme mental or emotional disturbance out of that testimony. You can certainly argue the nonstatutory mental mitigator.
Mr. Registrato: Yes, ma'am.
The Court: But that'sunless you can point to some other testimony, that's the only testimony that I heard on that mitigator.
Mr. Registrato: All right, Judge. I would ask for 7(e) as well.
The Court: Well, I think it's (f), the capacity of the defendant to appreciate the criminality of his conduct or to conform his or her conduct to the requirements of the law was substantially impaired.
Mr. Registrato: Yes, ma'am.
Defense counsel never presented further arguments relative to what testimony supported the extreme mental disturbance mitigator but instead acquiesced in the trial court's decision that the evidence did not support this mitigator. The trial judge eventually gave the jury instructions which addressed nonstatutory mitigation and the statutory mitigator that "the defendant may have had impaired capacity to conform his conduct to the requirements of the law," but did not address the extreme mental or emotional disturbance mitigator. Accordingly, we deny this claim.
In his final ground, Johnston asserts that the trial court erred when it did not address in its sentencing order the "extreme mental or emotional disturbance" statutory mitigator. We disagree. Defense counsel never requested the trial court to find the statutory mitigator that the homicide was committed while Johnston was under the influence of extreme mental or emotional disturbance, and hence this ground is not preserved for appellate purposes. Additionally, this mitigator was not established by the evidence, *360 but was in fact contradicted by Johnston's own version of what occurred during the murder. According to his story, he meant to grab Coryell's shoulder because he wanted her attention, but grabbed her neck instead and held it only for a brief period. He asserted that he was aware the whole time about what he was doing and never mentioned that he was angry or had an extreme emotional problem at the time.
Finally, although Johnston does not challenge the proportionality of his death sentence, this Court must still ensure that the sentence is proportional. Rimmer v. State, 825 So.2d 304, 331 (Fla. 2002) ("Although appellant does not argue the proportionality of the death sentence in this case, this Court must nevertheless conduct a proportionality review."), cert. denied, ___ U.S. ___, 123 S.Ct. 567, 154 L.Ed.2d 453 (2002). This review "is not a comparison between the number of aggravating and mitigating circumstances; rather, it is a thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it with other capital cases." Beasley v. State, 774 So.2d 649, 673 (Fla.2000) (internal quotation marks omitted).
In this case, despite Johnston's allegation that the victim was killed in the parking lot and that he staged her death to look like a sexual assault, the grass which was clutched in the victim's hand tells another taleone where she was still struggling for life at the edge of the pond after being sexually assaulted. The jury recommended the death penalty by a vote of twelve to zero. The trial court found such a punishment was appropriate after considering all the evidence and properly weighing the aggravators against the mitigators. Specifically, the court found four aggravating factors,[11] one statutory mitigator,[12] and numerous nonstatutory mitigators.[13]
*361 Upon review, we find that the circumstances of this case are similar to other cases in which we have upheld the death penalty. See Orme v. State, 677 So.2d 258, 263 (Fla.1996) (holding the death sentence proportional for the sexual battery, beating, and strangulation of victim where there were three statutory aggravators HAC, pecuniary gain, and sexual battery and both statutory mental mitigators); Schwab v. State, 636 So.2d 3, 7 (Fla. 1994) (holding the death sentence proportional for kidnapping, murder, and sexual battery of a boy, where prior conviction of violent felony, murder in the course of a felony, and HAC were proven). Comparing these circumstances with those of the foregoing and other capital cases, we conclude that death is proportionate.

CONCLUSION
We affirm Johnston's first-degree murder conviction and death sentence. We also affirm his convictions and sentences for kidnapping, robbery, sexual battery, and burglary of a conveyance with assault.
It is so ordered.
SHAW, WELLS, LEWIS, and QUINCE, JJ., and HARDING, Senior Justice, concur.
PARIENTE, J., concurs in part and dissents in part with an opinion.
ANSTEAD, C.J., concurs in result only.
PARIENTE, J., concurring in part and dissenting in part.
Although I concur in the majority's disposition of the other juror-related matters, I would not affirm the conviction at this time. I would instead remand this case for the trial court to conduct a juror interview to determine whether juror Robinson was abusing drugs during the guilt-phase portion of the trial. Juror Robinson was the forewoman of the jury. Robinson was arrested for possession of crack cocaine, marijuana and a loaded firearm on the evening of the first day of the penalty phase. This occurred only five days after the jury's guilt-phase decision. In fact, jury selection commenced on June 7 and the juror's arrest occurred only nine days later on June 16. Although juror Robinson was replaced during the penalty phase as a result of this arrest, the proximity in time and nature of the arrest in relation to the guilt phase amount to more than mere speculation or conjecture as to whether Robinson abused drugs during trial.
I recognize that there must be some evidence of misconduct in order to require a jury interview. Further inquiry of jurors is permissible only if the moving party has made sworn factual allegations that, if true, would require the trial court to order a new trial. See Baptist Hospital of Miami v. Maler, 579 So.2d 97, 100 (Fla. 1991). However, use of crack cocaine by a juror during trial would be an overt act subject to judicial inquiry and, if true, would require a new trial. The allegations *362 in this case are a far cry from the cases cited by the majority. See majority op. at 357, note 10. In Hackman v. City of St. Petersburg, 632 So.2d 84, 85 (Fla. 2nd DCA 1993), the allegation was that the "jury may have overheard statements made by the judge from the bench while the jury was seated in the jury room and also when seated in the jury box." Clearly that allegation, without more, amounts to an insufficient basis for a jury interview. The case of Walgreens, Inc. v. Newcomb, 603 So.2d 5, 6 (Fla. 4th DCA 1992), involved a situation where the trial court denied a request for juror interviews after counsel violated the rules prohibiting contact with jurors in gathering facts to support an allegation of misconduct. There is no indication of improper contact by counsel with jurors in this case.
Although the defense in this case did not present evidence of any apparent outward manifestation of intoxication, the use of crack cocaine may not be readily apparent. Additionally, crack cocaine is highly addictive. It is troubling that we are affirming this death case without obtaining an answer to the question of whether the forewoman of the jury used crack cocaine during the trial and in deliberations.[14] Certainly, the use of crack cocaine by a juror in a capital case, if true, would require a new trial. Cf. Gamble v. State, 44 Fla. 429, 33 So. 471, 473 (1902) (holding that if intoxicants have been used by a juror, a "presumption arises in favor of the convicted defendant that it resulted injuriously to him"). Thus, given the seriousness of this allegation, I would remand for a jury interview to allow inquiry into whether the juror was using drugs during the trial. In my view, the circumstances of this case demand this action at a minimum.
NOTES
[1] Johnston drove a Buick Skyhawk that had recently been in a collision, causing one of his headlights to be out of adjustment. One of the taillights was also out.
[2] See Spencer v. State, 615 So.2d 688 (Fla. 1993).
[3] The trial court found the following aggravators: (1) the defendant was previously convicted of violent felonies; (2) the crime was committed while Johnston was engaged in the commission of sexual battery and a kidnapping; (3) it was committed for pecuniary gain; and (4) it was especially heinous, atrocious, or cruel.
[4] The court found defense counsel proved that Johnston's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of law was substantially impaired and gave it moderate weight.
[5] Defense counsel objected to seating the alternate juror, asserting that this juror had shaken hands with the victim's family and had given them his condolences.
[6] Pursuant to section 938.30(9), the failure to pay court costs results in simply civil contempt. See § 938.30(9), Fla. Stat. (1999) ("Any person failing to appear or willfully failing to comply with an order under this section, including an order to comply with a payment schedule, may be held in civil contempt.").
[7] As this Court has recognized, "civil contempt is neither a felony nor a misdemeanor but a power of the courts." Ducksworth v. Boyer, 125 So.2d 844, 845 (Fla. 1960).
[8] See Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982) ("[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.").
[9] See Bruno v. State, 807 So.2d 55, 63 (Fla. 2001) ("Whereas the main question on direct appeal is whether the trial court erred, the main question in a Strickland claim is whether trial counsel was ineffective. Both claims may arise from the same underlying facts, but the claims themselves are distinct andof necessityhave different remedies: A claim of trial court error generally can be raised on direct appeal but not in a rule 3.850 motion, and a claim of ineffectiveness generally can be raised in a rule 3.850 motion but not on direct appeal.") (footnotes omitted).
[10] See Hackman v. City of St. Petersburg, 632 So.2d 84, 85 (Fla. 2d DCA 1993) ("The motion to interview and supporting affidavits are speculative at best. As such, they fail to establish a legally sufficient reason to interview the jurors."); Walgreens, Inc. v. Newcomb, 603 So.2d 5, 6 (Fla. 4th DCA 1992) ("A request to interview a juror requires something more than conjecture and speculation by movant's counsel.").
[11] The trial court found the following aggravators: (1) the defendant was previously convicted of violent felonies; (2) the crime was committed while Johnston was engaged in the commission of sexual battery and a kidnapping; (3) it was committed for pecuniary gain; and (4) it was especially heinous, atrocious, or cruel (HAC).
[12] The court found defense counsel had proven that Johnston's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired and gave it moderate weight.
[13] The trial court found the following nonstatutory mitigation: (1) the time passing between the decision to cause the victim's death and the time of the killing itself was insufficient under the circumstances to allow cool and thoughtful consideration of his conduct (no weight); (2) the defendant will not be a danger to others while serving a sentence of life in prison (no weight); (3) the defendant has shown remorse (slight weight); (4) the defendant did not plan to commit the offense in advance (no weight); (5) the defendant has a long history of mental illness (slight weight); (6) the defendant suffers from a dissociative disorder (no weight); (7) the defendant suffers from a seizure disorder and blackouts, but there is no evidence that any such disorder contributed to this crime (no weight); (8) the murder was the result of impulsivity and irritability (no weight); (9) the defendant is capable of strong, loving relationships (slight weight); (10) the defendant is a man who excels in a prison environment (slight weight); (11) the defendant could work and contribute while in prison (slight weight); (12) the defendant has "extraordinary musical skills and is a gifted musician" (no weight); (13) the defendant has obtained additional education from the University of Florida (no weight); (14) the defendant served in the U.S. Air Force (slight weight); (15) the defendant refused worker's compensation despite constant headaches and seizures (no weight); (16) during the time the defendant was on parole, he excelled and was recommended for early termination (slight weight); (17) the defendant was a productive member of society after his release from prison (slight weight); (18) when notified that the police were looking for him, he did not flee but turned himself in (slight weight); (19) the defendant demonstrated appropriate courtroom behavior during trial (slight weight); (20) the defendant tried to conform his behavior to normal, but has been thwarted by his mental illness and brain dysfunction (slight weight); (21) the defendant has a special bond with children (no weight); (22) the defendant has the support of his mother and sister (slight weight); (23) since the defendant can be sentenced to multiple consecutive life sentences based on the other crimes, he will die in prison and the death penalty is not necessary to protect society (no weight); (24) the totality of circumstances do not set this murder apart from the norm of other murders (no weight); (25) the defendant might be subject to Jimmy Ryce Act involuntary commitment (no weight); and (26) the defendant offered to be a kidney donor for his ex-wife (slight weight).
[14] The potential problems with this juror, who was the foreperson, are even more troubling to me given that this is the same juror who failed to disclose in voir dire that she faced criminal charges the previous year, and who was facing arrest and a civil contempt sanction for failure to pay the fine in her criminal case when she served on the jury in Johnston's guilt-phase trial. See majority op. at 355-56.