913 So.2d 564 (2005)
Franklin Delano FLOYD, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-35.
Supreme Court of Florida.
October 12, 2005.
*567 James Marion Moorman, Public Defender and Douglas S. Connor, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Carol M. Dittmar, Senior Assistant Attorney General, Tampa, FL, for Appellee.
*568 PER CURIAM.
We review Franklin Delano Floyd's appeal from his judgment of conviction of first-degree murder and sentence of death. We have jurisdiction, see art. V, § 3(b)(1), Fla. Const., and as we explain below, affirm the judgment and sentence.

I. THE FACTS AND PROCEEDINGS BELOW
Floyd was indicted in 1997 for the 1989 first-degree murder of Cheryl Commesso. He was granted co-counsel status, and trial was held in September 2002.

A. The Guilt Phase
The evidence at trial showed that in the spring of 1989 appellant was living under an alias with his daughter Sharon and her son in Pinellas County, Florida. Shortly after St. Patrick's Day, Floyd telephoned Diana Rife, a friend and co-worker of both Sharon and Commesso, and angrily demanded that Rife provide the name and address of Commesso's parents, with whom Commesso was living at the time. Floyd threatened "to get" Commesso for hurting his family and stated that she "would regret" her actions. Floyd claimed that Commesso was responsible for Sharon's loss of Medicaid coverage for Michael, his sick grandson. Not long after that date, Rife emerged from the club at which the three women worked as exotic dancers and saw appellant and Commesso, engaged in a heated argument. Frightened, Rife intervened because she had never seen Floyd so angry and she knew that he had recently caused a bruise on her friend's face.
During the first week of April, the nineteen-year-old victim, who lived with her parents and brother, left their home with a packed bag after telling her brother she would see him the following week. That was the last time her family saw her alive. On May 15, her car was located at the St. Petersburg/Clearwater airport, where it had been parked since April 7, 1989.
In May 1989, appellant told a neighbor that he was going on vacation, and he asked that she mow the lawn and collect his mail. He stated that he would return on June 15. On that date, however, appellant and his daughter, using assumed names, married in New Orleans, and on June 16 their trailer in Florida burned down. Subsequently, appellant telephoned his neighbor and asked that she burn all of his mail.
Six years later, in March 1995, two evidentiary discoveries in disparate areas of the country led to appellant's arrest for Commesso's murder. First, landscape workers discovered Commesso's skeletal remains in an area off Interstate 275 in Pinellas County, Florida. Other items recovered included two silicone breast implants, clothing, jewelry, artificial fingernails (including one with a jewel on it), and a clump of fibers (a hair weave). Roots growing in Commesso's skeleton indicated her remains had been there for six or seven years.
Second, the owner of a Kansas auto repair business, beginning work on a truck he recently had purchased, discovered a large envelope, folded and stuck between the truck bed and the top of the gas tank, a space of about three inches. The package contained 97 small and irregularly cropped photos, including many pictures of a woman, beaten and bound. Floyd had stolen the truck in which the photos were discovered in Oklahoma in September 1994. The truck was found abandoned in Texas the next month, and subsequently sold at auction.
At trial, Commesso's father, brother, two friends, and an acquaintance positively identified the victim in the pictures as Cheryl Commesso. The medical examiner *569 determined that the cause of Commesso's death was two bullet wounds in the back of the skull. He determined, however, that the skull's right cheek had been fractured shortly before death, and that the injuries to Commesso's cheek, which were visible in the pictures, were consistent with the skull fracture. In addition, the injuries were consistent with blunt force trauma, possibly caused by a closed fist.
An FBI analyst testified regarding the similarities between the items worn by Commesso in the pictures, such as articles of clothing, jewelry, and a bejeweled artificial fingernail, and the items found with her remains, and found no inconsistencies. Further, one of the pictures of the bound victim contained an image of someone else's thumb. The FBI analyst compared it with a picture of Floyd's thumb, pointed out approximately nine common characteristics, and concluded that he could not exclude Floyd's thumb from the thumb in the picture of the victim.
Other testimony connected Floyd to pictures found in the envelope, which were admitted at trial. Although the court excluded several pictures from jury viewing because they depicted child pornography, the majority of the pictures were shown to the jury. The sixteen pictures of Commesso depicted her blindfolded (in some), bound, beaten, and bleeding, and several were close-up pictures of her genitalia. Floyd's former neighbor, who had been his grandson's babysitter, identified the sofa in the pictures of Commesso as having been destroyed in the fire that engulfed Floyd's trailer in June 1989. She also pointed out the trailer's window and door to Floyd's bedroom that appeared in the picture. In addition, she identified a boat in one of the envelope's pictures as having belonged to Floyd at that time. She had been out on boats with him while he lived in the trailer park and knew his daughter and had met the victim with Floyd on more than one occasion. She remembered Commesso's sportscar and details about the victim, such as the gem on her fingernail.
The jury was told that Sharon, appellant's daughter/wife, was deceased. A close, high school friend of Sharon's, who knew her in 1985-89, testified. She identified appellant as Sharon's father and identified Sharon in several pictures from the truck envelope.
Helen Hill Keller testified that she knew appellant in Oklahoma in 1993 and 1994. She was shown pictures from the envelope and identified her then eight-year-old daughter as their subject. In each, the child was fully clothed but in some was posed provocatively. Floyd had never shown her these pictures. She also identified pictures of her children that she had provided to the police. Floyd had taken these pictures and given them to her. In both picture sets, her child is wearing the same apparel, and the locations of the shots are Floyd's apartment and car. She testified that all the pictures were taken in approximately the same time period. Keller also testified that after she was notified that she would be a witness in the case, Floyd sent her a threatening letter in which he instructed her not to testify.
James Davis was the principal of the elementary school in Choctaw, Oklahoma, at the time Floyd's grandson/stepson Michael attended first grade. At that time, an Oklahoma court had severed Floyd's visitation rights with Michael upon finding that Floyd was not Michael's natural father. Davis testified that on September 12, 1994, he met with Floyd in his office and they went to Michael's classroom. The three then went to Davis's truck, and against his consent, Davis drove to a "secluded wooded area," where Floyd instructed him to park adjacent several bales *570 of hay. Davis observed an unzipped, fully open sleeping bag on the ground with several bulges underneath it. After telling Michael they were leaving him to search for Michael's dog, Floyd directed Davis into the woods where he handcuffed him to a tree. Floyd returned twice for directions regarding the operation of the truck. Davis subsequently heard Floyd loading things into the camper and the truck engine start. Davis called out for help and was rescued about four hours later. When rescued, he noted that the items he previously observed when he parked the truck were no longer there. He also disclaimed knowledge and ownership of the packet of pictures recovered from the truck in March 1995. The jury was told that Floyd's own truck was found abandoned near the elementary school on the afternoon of the incident. Finally, Davis testified that Floyd also sent him a letter prior to trial warning him not to testify; Davis read the letter to the jury.
The jury found appellant guilty of first-degree murder.

B. The Penalty Phase
In the penalty phase, Floyd stipulated that he absconded from federal parole in 1973 and was thus a fugitive at the time of Commesso's murder. He also stipulated to several prior violent felony convictions: a 1963 bank robbery, 1995 convictions for kidnapping and carjacking, and 1997 convictions for burglary with intent to commit assault and assault with a dangerous weapon. The victim of his 1997 assault testified to the circumstances of the crime. In addition, Davis testified regarding his September 1994 experience with Floyd, but provided more details than he had been permitted to give during the guilt phase. For example, he testified that Floyd was armed and coerced his cooperation with a gun, had threatened his life, and after handcuffing Davis to the tree, Floyd wrapped duct tape over Davis's mouth and around his head.
Floyd refused to permit the presentation of any expert testimony on mental health mitigation to the jury. Floyd was the sole defense witness on mitigation. He described to the jury the sexual abuse he suffered beginning at an orphanage when he was five and occurring later when he was imprisoned as a young man. He admitted to nineteen felony convictions.
The trial court required the jury to make a specific finding as to each aggravating factor and record the vote as to each. Accordingly, the jury unanimously recommended the sentence of death and unanimously found each of the following aggravating factors: under sentence of imprisonment, prior violent felony conviction, and committed during a kidnapping.
After a thorough colloquy at the subsequent Spencer[1] hearing, Floyd again waived his right to present expert psychiatric testimony. Defense counsel, however, proffered an oral summary of what the doctor's testimony would have been, and appellant made a three-hour statement to the court. In its sentencing order, the trial court assigned great weight to each of the following aggravating circumstances: under sentence of imprisonment, prior violent felony conviction, and committed during a kidnapping. After reviewing the record for mitigation, the court found one statutory mitigating factor  the age of the defendant (46 at time of murder and 59 at trial) when coupled with personality disorders, emotional immaturity, and poor impulse control  and ascribed this single factor some weight. The court found two statutory factors did not exist: extreme mental or emotional disturbance and substantially *571 impaired capacity. The court, however, did find the nonstatutory factor that Floyd had a psychological imbalance stemming from personality disorders and afforded the factor some weight. In addition, the court found other nonstatutory factors and afforded the weight indicated: abusive childhood (some weight), Floyd's several, lengthy federal and state sentences (very little weight), and Floyd's ill health (very little weight). The court concluded that the "aggravating circumstances in this case far outweigh the minimal mitigation" and sentenced appellant to death.

II. THE ISSUES ON APPEAL
On appeal, Floyd raises eight issues regarding: (1) sufficiency of the evidence; (2) admission of collateral crime evidence; (3) admission of photographic evidence; (4) admission of expert testimony; (5) the State's closing argument; (6) inquiry into prior convictions; (7) the applicability of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); and (8) the applicability of the Eighth Amendment. We address each in turn below and conclude with the issue of proportionality of the sentence.

A. Competent, Substantial Evidence
Appellant contends that the evidence presented at trial was wholly circumstantial and is insufficient to support the jury's finding that he is guilty of first-degree murder. The denial of a motion for judgment of acquittal is reviewed de novo. Pagan v. State, 830 So.2d 792, 803 (Fla.2002). "A defendant, in moving for a judgment of acquittal, admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." Lynch v. State, 293 So.2d 44, 45 (Fla.1974). "If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." Pagan, 830 So.2d at 803. When the evidence is wholly circumstantial, however, the State must present evidence inconsistent with any reasonable hypothesis of innocence. Darling v. State, 808 So.2d 145, 155 (Fla.2002). The question of whether the evidence of guilt excludes all reasonable hypotheses of innocence, however, is for the jury, and an appellate court will not reverse where competent, substantial evidence supports the verdict. State v. Law, 559 So.2d 187, 188 (Fla.1989). This case does not rest wholly on circumstantial evidence; thus the latter standard does not apply. Even if it did, the standard is met here.
At trial, appellant contended that the pictures in the envelope found under the truck bed in March 1995 were not his, that someone planted the pictures after he abandoned the truck, and that the bound and beaten woman in the pictures was not Cheryl Commesso. The evidence showed that the truck Floyd stole from the school principal was found abandoned in Texas, and the new owner took the vehicle from Oklahoma to Kansas and found the pictures in their small hiding place only because he was working on the wiring underneath the truck. The State demonstrated through testimony of several witnesses that the photographs belonged to Floyd. The people in the photographs were people Floyd knew in various years and places during his life (his daughter/wife, Mrs. Keller's children, and Cheryl Commesso) and of things associated with appellant (his boat, his homes, and his couch). In addition, the pictures were irregularly cropped and most were of these women and children in similar sexually suggestive poses. No fewer than four witnesses identified Commesso as the bound and beaten victim *572 in a series of pictures. Commesso disappeared in early April 1989 and her car was left at the airport on April 7. It was undisputed that the human remains found by I-275 in 1995 were hers, and an expert testified based on roots growing in her remains that she had been there for six or seven years. Two witnesses testified that Floyd knew Commesso. Further, Diana Rife testified that in late March, not long before Commesso disappeared, Floyd called her angrily demanding Commesso's home address and threatening that Commesso was "going to regret" hurting his family. Soon thereafter, she witnessed an angry screaming match between the two, in which she intervened because she was afraid for Commesso. Another witness identified the interior of Floyd's trailer and his couch as the place where the pictures of the victim were taken. An FBI analyst identified numerous similarities between the clothes, jewelry, fingernails, and other items found with the victim's remains and those she wore in the pictures. Also, the thumb appearing in one of the pictures of the victim was consistent with Floyd's thumb. Importantly, the medical examiner testified that the facial injuries evidenced by the pictures were recent and consistent with the injury to the skull, and these injuries occurred shortly before her death, which was caused by two bullets to the back of the skull. In May 1989 Floyd left the trailer, which burned soon thereafter, and the state. He married his daughter using an assumed name and directed a neighbor by phone to burn his mail. In addition, appellant wrote to two witnesses, threatening and warning them not to testify at trial.
As explained above, the evidence in the case was both direct and circumstantial, and contrary to Floyd's claim, the verdict does not rest on an impermissible pyramiding of inferences. Accordingly, we hold that the verdict is supported by competent, substantial evidence.[2]

B. Evidence of Other Crimes
Floyd next contends that the trial court abused its discretion by admitting evidence regarding his 1994 carjacking and kidnapping of Principal Davis and Floyd's grandson/stepson Michael. Floyd argues that the evidence was relevant only to show bad character and propensity for violence and that the unfair prejudice of the evidence exceeded its probity.
Floyd sought to exclude evidence regarding the incident and offered to allow Davis to testify that he met Floyd for the first time on September 12, 1994, and on that day Floyd stole his truck. In addition, Davis could testify that neither the pictures nor the packaging material found in the truck were his and that he did not put them in the truck. After hearing extensive argument and weighing the danger of unfair prejudice against the evidence's probative value, however, the court determined that Davis's testimony was admissible and that a truncated presentation of the facts was relevant to place Floyd in sole and exclusive possession of the truck, to show Floyd committed the act while in possession of the photographs memorializing the Commesso homicide, and to demonstrate the significance of both Michael and the picture collection to Floyd. Having summarized Davis's testimony above, we need not repeat it here.
Evidence of other crimes factually dissimilar from the charged crime are nevertheless admissible if relevant, e.g., to support the State's theory of the motive in the case. Jorgenson v. State, 714 So.2d 423, 427 (Fla.1998). However, "[e]ven after *573 determining the evidence is relevant, a trial court in every case must also consider section 90.403," which prohibits the admission of relevant evidence when the danger of unfair prejudice substantially exceeds the evidence's probative value. Sexton v. State, 697 So.2d 833, 837 (Fla.1997).
Certainly, Davis's testimony that he met Floyd for the first time on a specific day in September 1994 and that their encounter ended with Floyd stealing Davis's truck was relevant and admissible, as was Davis's testimony that he did not own the pictures and did not hide them in his truck. Such evidence was relevant to link appellant to the truck, demonstrate that he had exclusive possession of it, and connect the photographs found in the truck to him. However, we conclude that the principal's testimony regarding the kidnapping was not relevant and should have been excluded. For example, his testimony about taking Michael out of class, the involuntary trip to the woods, and being handcuffed to a tree and stranded were irrelevant to whether the defendant had exclusive possession of the truck and the photographs. However, as we explain below, the erroneous admission of this evidence was harmless.
In State v. DiGuilio, 491 So.2d 1129, 1135, 1138 (Fla.1986), we stated that an error is harmless if, after close review of the record, the reviewing court concludes beyond a reasonable doubt that the error in the trial court did not affect or contribute to the verdict. Such analysis is not "a device whereby the appellate court substitutes itself for the jury, examines the permissible evidence, excludes the impermissible evidence, and determines that the evidence of guilt is sufficient or even overwhelming based on the permissible evidence." Id. at 1136. The DiGuilio test applies to the erroneous admission of collateral crime evidence. See State v. Lee, 531 So.2d 133, 136 (Fla.1988) ("The erroneous admission of collateral crime evidence is subject to harmless error analysis as set forth in DiGuilio."); accord Goodwin v. State, 751 So.2d 537, 547 (Fla.1999) ("It is clear that Lee requires the application of DiGuilio to the improper admission of collateral crime evidence.").
Floyd was charged with the murder of Cheryl Commesso, and the focus of this lengthy trial was on that crime. As recounted above, the State produced several witnesses to show that Floyd knew the victim, had promised revenge against her, and had a heated argument with her shortly before she disappeared. Other testimony inextricably linked the truck and the photographs of the beaten and bound victim to Floyd, including placing his trailer as the site at which they were taken. Expert witnesses identified Commesso's remains and demonstrated that she was shot, execution style, shortly after Floyd beat her. Other witnesses identified the victim in the photographs as Cheryl, and another expert noted similarities between the clothing and other items Commesso wore in the photographs and items found with the victim's remains.
In contrast, the admission of the collateral crime evidence of the kidnapping incident, though erroneous, was strictly limited. The principal's brief testimony was the only evidence offered regarding the kidnapping. The court prohibited mention of sensational facts, such as Floyd's use of a gun to coerce the principal and his duct-taping the principal's mouth and head. The court also later informed the jury that before the incident an Oklahoma court had determined that Floyd was not Michael's natural father and severed Floyd's visitation rights. In addition, before the principal testified the court briefly summarized his testimony to the jury, and the prosecutor asked only leading questions. Further, *574 the court instructed the jury  both before and after the principal testified  to consider the evidence of other crimes only with regard to Floyd's possession of the truck. Finally, the State only briefly referred to the incident in closing argument. In light of the limits the trial court placed on the testimony and the State's limited use of the evidence, we hold that it did not affect the jury's verdict and was, beyond a reasonable doubt, harmless error.

C. Admission of Photographic Evidence
At trial, appellant objected to the admission of all 97 photographs found in the packet. The court found that all of the pictures were relevant, but reviewed each picture under section 90.403, Florida Statutes (2002), weighing the probative value against the danger of unfair prejudice, and excluded seven of the photographs from jury review. Floyd admitted that the sixteen photographs of the victim, a photo of Floyd's boat, and one picture of Floyd's daughter/wife were relevant and admissible. On appeal, Floyd contends that the admission of other photographs was unfairly prejudicial and, for purposes of appeal, categorizes the objectionable pictures into three groups: photos of Floyd's daughter, photos of Keller's child, and photos of female genitalia. This Court applies an abuse of discretion standard to a trial court's application of the unfair prejudice test of section 90.403, Florida Statutes. Mansfield v. State, 758 So.2d 636, 648 (Fla.2000).
At trial, Floyd maintained that the pictures found hidden under the truck were not his and that someone had planted and tampered with them. Accordingly, the State sought to link the pictures closely to Floyd and negate any suggestion of tampering by demonstrating that the 97 pictures, including those of Commesso, were an intact collection.
The trial court reviewed each picture more than once before making individual decisions about the admissibility of each photo and considering the danger of unfair prejudice as to each. The judge excluded from jury review seven photos depicting children's vaginas or capital sexual battery or both because she found them so prejudicial that the jury would not be able to follow the law. The court concluded that the other pictures were not unfairly prejudicial. The pictures of Sharon Marshall, whom the jury knew Floyd had married, showed the young woman in various stages of dress and nude. The court said they were small and faded. At trial, Sharon's high school friend identified Sharon as the person pictured and identified appellant as the man she knew as Sharon's father.
In the pictures of Keller's child, the girl is fully clothed although her poses are sexually suggestive. At trial, her mother identified the locations for the pictures as Floyd's car and apartments in 1993-1994. She also testified that the child was wearing the same outfits she wore in the pictures Floyd took and gave to Ms. Keller at the time. Finally, the court also permitted the jury to see pictures of unidentifiable women's genitalia  the women are unidentifiable because of the way the pictures were cut. Nothing in the record supports Floyd's claim that some of these included children.
In determining whether the jury should see all of the other photos, the trial court recognized that many of the pictures were sexually suggestive or pornographic in nature, but did not find them unfairly prejudicial. The court took into account the similarity of poses and content of the pictures to each other and especially to the pictures of Commesso, in which she is partially clothed and which include close-up pictures of her genitalia. In light of Floyd's claims regarding the pictures, the *575 court allowed the State to have as many as possible identified by witnesses and to otherwise interrelate the photos. The court concluded that the jury would not convict Floyd for murder based on the fact that he collected pornographic and sexually suggestive pictures and permitted most of the collection to be shown to the jury.
The weighing of probativeness versus unfair prejudice is best addressed by the trial court, Sims v. Brown, 574 So.2d 131, 133 (Fla.1991), and we will not overturn that court's decision absent a clear abuse of discretion. The sixteen pictures of the victim were the most prejudicial photos admitted at trial, and appellant has failed to demonstrate that the court abused its discretion in determining the admissibility of the other pictures under section 90.403. Accordingly, we hold that the trial court did not abuse its discretion in admitting the pictures for jury review. Further, even if the admission of some of the pictures was error, we hold it was harmless beyond a reasonable doubt. See DiGuilio, 491 So.2d at 1129.

D. Expert Testimony
Floyd argues that the trial court erred in admitting an FBI analyst's expert testimony comparing items found with Commesso's remains with the pictures depicting her bound and beaten. "The determination of a witness's qualifications to express an expert opinion is peculiarly within the discretion of the trial judge, whose decision will not be reversed absent a clear showing of error." Ramirez v. State, 542 So.2d 352, 355 (Fla. 1989). We have stated that expert opinion is admissible when it meets the following four requirements:
(1) the opinion evidence must help the trier of fact; (2) the witness must be qualified as an expert; (3) the opinion must be capable of being applied to evidence at trial; and (4) the probative value of the opinion must not be substantially outweighed by the danger of unfair prejudice.
Glendening v. State, 536 So.2d 212, 220 (Fla.1988). Floyd contends that the first and fourth prongs were not met, but the latter claim regarding unfair prejudice is not preserved for review.
Thomas Musheno, the expert witness in question, held advanced degrees in photography and had specialized training in performing image comparison analysis, i.e., comparing items and identifying patterns and characteristics in minute detail. He worked as an FBI examiner in this capacity and previously had testified as an expert in this area. In this case, the trial court admitted his testimony over appellant's objection that any juror was capable of examining the evidence for similarities and differences.
Musheno had examined the items found with Commesso's remains in 1995, such as the clothing, jewelry, and artificial fingernails, and compared them with the items she wore in the pictures in which she appeared beaten and bound. At trial he testified using pictures he had taken of the 1995 evidentiary items, pointing out detailed, consistent characteristics and patterns between the items found and the items Commesso wore in the 1989 pictures. He found no differences and could not exclude any of the 1995 items from those the victim wore in the pictures. In addition, he compared a picture of Floyd's thumb with the thumb that appeared in one of the Commesso pictures, pointing out nine common characteristics, e.g., folds of skin and shape, and testified that he could not exclude Floyd's thumb as the thumb in the recovered pictures. The FBI analyst expressly did not make a positive identification regarding any item.
*576 The trial court determined that this testimony was helpful to the jury. Contrary to Floyd's claim, the fact that the jurors could examine the evidence themselves does not negate the helpfulness of Musheno's detailed, comparative analysis. Nor has appellant demonstrated any danger of unfair prejudice. Accordingly, we hold that the trial court did not abuse its discretion by admitting Musheno's expert testimony.

E. Closing Argument
Defense counsel moved for mistrial during the prosecutor's closing argument, contending that the State had argued facts not in evidence. The prosecutor told the jury that Diana Rife testified that she intervened in the heated argument between Floyd and the victim because Commesso had earlier in the evening admitted that Floyd had "hit" her, causing a bruise. A motion for mistrial should be granted only when the error is deemed so prejudicial that it vitiates the entire trial, depriving the defendant of a fair proceeding. Dessaure v. State, 891 So.2d 455, 464 (Fla.2004). The standard of review applied to motions for mistrial is abuse of discretion. Goodwin v. State, 751 So.2d 537, 546 (Fla.1999).
Although defense counsel's objection during Rife's testimony prevented her from actually stating that Floyd had "hit" Commesso, her testimony clearly indicated that Floyd had caused a bruise on the victim and that this was a source of concern to Rife.[3] The prosecutor's statement in closing argument was thus incorrect, but the remark was insufficient to vitiate the fairness of the trial. In this case the prosecutor made no further reference to the alleged battery, and the court instructed the jurors to rely on their own memories as to the evidence. Accordingly, we hold that the trial court did not abuse its discretion by denying appellant's motion for mistrial.

F. Inquiry into Prior Convictions
Floyd argues that the trial court erred in denying his motion for mistrial, made during the penalty phase. Floyd testified on direct examination, without equivocation or elaboration, that he had nineteen prior convictions. Nevertheless, on cross-examination the prosecutor also asked the question, and appellant responded: "I don't really know. I'm guessing 19." Although the number was correct, the prosecutor then inquired into the nature of each conviction and asked Floyd whether he actually committed each crime. Without objection, Floyd responded to a litany of questions regarding his prior convictions. Defense counsel finally objected after the prosecutor asked about Floyd's 1963 conviction for child molestation and Floyd stated that he did not commit the crime. In response to defense counsel's objection on the ground of improper impeachment, the prosecutor argued that because Floyd said he was "guessing" about the number of convictions, further inquiry was permitted. The court denied the mistrial motion but instructed the jury to disregard the last question and answer. In addition, at Floyd's request, the court permitted him to address the jury  directly and without cross-examination  to explain the basis for his claim that he was wrongly convicted of child molestation.
As previously stated, we apply an abuse of discretion standard of review to motions for mistrial and will reverse only when the error is deemed so prejudicial that it vitiates the entire trial. Dessaure, 891 So.2d *577 at 464. We find that the State's further inquiry into the nature of Floyd's prior conviction constituted improper impeachment. Fulton v. State, 335 So.2d 280, 284 (Fla.1976) (stating that if a witness denies a prior conviction, the specific offense may be identified only by entry of its record into evidence, but if a witness admits the conviction, no inquiry into the name or nature of the crime is permitted); accord Cummings v. State, 412 So.2d 436, 438 (Fla. 4th DCA 1982) ("If the witness admits the number of his convictions, the prosecution may not ask further questions regarding prior convictions, and in particular the prosecution may not question the witness as to the nature of the crimes."); see also Gavins v. State, 587 So.2d 487, 490 (Fla. 1st DCA 1991).
We do not find, however, that mention of the molestation conviction requires a new penalty phase. First, until mention of the child molestation charge, the jury already had been told about the other convictions and their nature. Floyd stipulated that he absconded from federal parole in 1973 and was under sentence of imprisonment at the time of the Commesso murder and stipulated to his convictions for the prior violent felonies of bank robbery, kidnapping, carjacking, burglary, and assault. In fact, the jury had heard further testimony during the penalty phase from Davis regarding Floyd's 1994 kidnapping and carjacking convictions. In addition, Carrie Box testified about her ordeal when appellant attacked her with a knife, which resulted in his 1997 convictions for burglary and assault with a dangerous weapon. Further, defense counsel objected specifically to the question and answer regarding the molestation conviction, and in response the court directed the jury to disregard both and permitted Floyd to make a statement to the jury. Accordingly, we hold that the trial court did not abuse its discretion by denying the mistrial motion.

G. The Ring Claim
The court denied Floyd's "Motion to Bar Imposition of the Death Penalty," which alleged that Florida's capital sentencing procedure violated Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). On appeal, Floyd acknowledges that this Court has rejected the contention on numerous occasions and presents no argument on the issue. See Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990) ("The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived.").
The jury in this case unanimously recommended death, and the trial court so sentenced appellant, finding three aggravators. As appellant concedes, this Court has repeatedly upheld the constitutionality of Florida's capital sentencing procedures in cases, such as this one, that include the prior violent felony aggravator. See Duest v. State, 855 So.2d 33, 49 (Fla.2003) ("We have previously rejected claims under Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)] and Ring in cases involving the aggravating factor of a previous conviction of a felony involving violence."), cert. denied, 541 U.S. 993, 124 S.Ct. 2023, 158 L.Ed.2d 500 (2004). In addition, this case involved the aggravator of murder committed while under sentence of imprisonment, which this Court has held may be found by the judge alone. See Allen v. State, 854 So.2d 1255, 1262 (Fla.2003) ("Moreover, one of the aggravating factors in this case was that the murder was committed while Allen was under a sentence of imprisonment. Such *578 an aggravator need not be found by the jury."). Appellant stipulated that he had absconded from federal parole and was a fugitive at the time of the murder. Accordingly, we affirm on this issue.

H. Constitutionality of the Death Sentence
Appellant argued to the trial court that the death penalty was unconstitutional because allegedly innocent people have been or could be executed. On appeal, he states that in a capital case the Eighth Amendment requires that the underlying homicide must be proven to a "virtual certainty." Because appellant has raised a different argument on appeal, this claim is not preserved for review. Steinhorst v. State, 412 So.2d 332 (Fla.1982). Nevertheless, we note that the standard of beyond a reasonable doubt requires a high degree of certainty. In discussing this standard, the Supreme Court has stated the following:
It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.
In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); see Richardson v. State, 604 So.2d 1107, 1109 (Fla. 1992) ("However, in light of the entire record, the error is harmless beyond any reasonable doubt. This record establishes to a moral certainty that Richardson killed Newton, and there is no reasonable possibility the verdict would have been different in the absence of this error."). Appellant is not entitled to any relief on this issue.

I. Proportionality
This Court is obligated to review each death sentence for proportionality, regardless of whether the issue is raised by the appellant. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Thus, to ensure uniformity in death penalty proceedings, "we make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." Anderson v. State, 841 So.2d 390, 407-08 (Fla.), cert. denied, 540 U.S. 956, 124 S.Ct. 408, 157 L.Ed.2d 292 (2003). In this case, the jury unanimously recommended death, and the trial court so sentenced Floyd. The court found three aggravating circumstances  under sentence of imprisonment, prior violent felony conviction, and committed during a kidnapping  and assigned each great weight. The court found one statutory mitigating factor to which it assigned some weight: the chronological age of the defendant when coupled with his personality disorders, emotional immaturity, and poor impulse control. The court also found the following nonstatutory mitigators and afforded the weight indicated: personality disorders and difficulty dealing with stressful conditions (some weight); abusive childhood (some weight), Floyd's various federal and state sentences ensured that he would never be released (very little weight); and Floyd's ill health (very little weight). The court determined that the "aggravating circumstances in this case far outweigh the minimal mitigation" and sentenced appellant to death.
We hold that Floyd's sentence is proportional in relation to other death sentences that this Court has upheld. See, e.g., Johnston v. State, 841 So.2d 349, 361 (Fla. 2002) (finding death sentence proportional where four aggravators were found, including *579 prior violent felony conviction and murder committed during commission of sexual battery and kidnapping, moderate weight was given one statutory mitigator, and slight weight and no weight ascribed to twenty-six nonstatutory mitigators); Singleton v. State, 783 So.2d 970, 979 (Fla. 2001) (finding sentence proportional where two aggravators found, including prior violent felony conviction; three statutory mitigators were found, including defendant's age (69), impaired capacity, and extreme mental or emotional disturbance; and several nonstatutory mitigators were found, including defendant suffered from mild dementia).

III. CONCLUSION
Having heard oral argument and considered each of the issues raised in this direct appeal in a capital case, we affirm appellant's judgment and sentence of death.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] Because appellant raised the issue of sufficiency of the evidence, our review of this issue meets this Court's duty to review the sufficiency of the evidence in all capital cases.
[3] Rife stated: "I was worried because I saw a bruise on her face earlier that night. She said that [Floyd] had." At this point, defense counsel objected. After hearing argument, the court said, "Move on."