[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14054

_____

D.C. Docket No. 8:11-cv-02094-EAK-TGW


RAY LAMAR JOHNSTON,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 3, 2020)

Before ED CARNES, Chief Judge, MARTIN, and ROSENBAUM, Circuit Judges.

ED CARNES, Chief Judge:

LeAnne Coryell had a mother and father, two brothers, and a six-year-old daughter. She was her parents' only daughter. She was her brothers' only sister. And, of course, she was her young daughter's only mother. LeAnne had recently celebrated her thirtieth birthday, and her family and friends had every reason to believe that she would be with them for a long time. She was in the prime of her life and had decades of living ahead of her. Or she should have.

## I. JOHNSTON'S CRIMES AGAINST LEANNE CORYELL AND THE TOTAL HARM THOSE CRIMES CAUSED

Tuesday, August 19, 1997, began as a typical day for LeAnne. That afternoon she went to work at Dr. Gregory Dyer's orthodontic office where she was a clinical orthodontic assistant. Johnston v. State, 841 So. 2d 349, 351 (Fla. 2002). He knew her to be someone who took pride in what she did, was exceptional at it, and had a good career ahead of her. She was warm and intelligent, positive, and passionate about all that she did. Dr. Dyer had been constantly reminded of "how incredibly fortunate and blessed [he] was" to have had her on his staff. That is the kind of person she was.

Around 6:00 p.m. that Tuesday evening, LeAnne called a good friend and told her that she was going to leave work around 8:00 p.m. and stop by the local supermarket to pick up a few items. She told the friend she'd call again when she got home.

LeAnne clocked out of work at 8:38 p.m.  She and her co-worker, Melissa Hill, tried to set the security system before leaving but had trouble with it.  LeAnne called Dr. Dyer's wife for instructions.  During their conversation Ms. Dyer asked about LeAnne's daughter Ansley, who was to start first grade the next week, and LeAnne told her: "She's with grandma, you know, doing the shopping and things before school."  Before their mother hung up, Ms. Dyer's young sons insisted on talking with LeAnne and telling her goodnight because they liked her so much. That is the kind of person she was.

After setting the alarm and leaving work, LeAnne stopped by the grocery store and bought, among other things, milk, grapes, fish, and green beans. Johnston, 841 So. 2d at 351.  She also got a Nickelodeon toothbrush for Ansley, some goldfish crackers, and some oatmeal cookies.  The kind of things a mother buys.  One of the employees at the grocery store who saw her that night described Leanne as "happy [and] smiling."  She and the cashier chatted about their kids, as they usually did, and LeAnne told the woman about the plans she and Ansley had for the next day.  The store's surveillance cameras showed her leaving the store at 9:23 p.m.  Johnston, 841 So. 2d at 351.

That was the last time anyone saw LeAnne alive.  Anyone other than Ray Lamar Johnston.  LeAnne had the misfortune of living in the same apartment complex as him, although they were not acquainted.  Johnston, 841 So. 2d at 351.

3

Before LeAnne arrived at the apartment building that Tuesday night, Johnston had gotten into an argument with one of his two roommates about his failure to pay his share of the utilities. After that argument Johnston went outside, which is where he was when LeAnne pulled into the parking lot and started unloading her groceries. Id. at 354–55.

Johnston walked up to LeAnne, said "hello," and offered to help her carry the groceries to her apartment. She either said "hello" back and declined his offer, or she didn't respond at all. Johnston didn't like being turned down or ignored by a woman. As he would later tell it, "I just wanted her attention, and I didn't get it and I grabbed her . . . . I just grabbed her around the neck . . . ." He threw LeAnne into the back seat of her own car and drove her to a dark field nearby, a field next to St. Timothy's Church. While a religious meeting was being conducted inside the church, Johnston was violently brutalizing LeAnne outside of it.

After he got her out of the car, Johnston removed all of LeAnne's clothes. He then either raped her or used a blunt object to penetrate her with such force that it caused both internal and external lacerations to her vaginal area. During his demeaning assault of her, Johnston whipped LeAnne repeatedly across the buttocks with her own belt. He whipped her with enough force that the blows left distinct bruises on her body in the shape of the metal design on the belt. He also beat her on her buttocks with another blunt object. Some of the bruising on

4

LeAnne's body was so deep that it invaded the underlying muscle and soft tissue. Her chin and the inside of her lip were lacerated, which could have been caused by a punch to the face or by her being thrown to the ground. Johnston inflicted all of the blows, beating, and injuries to LeAnne while she was alive. He made her suffer.

Johnston could have stopped and left LeAnne there. She would have been naked, beaten, violated, and in pain alone in a dark field. But she would have been alive. She could have made her way to the church and been rescued and gotten medical help; she could have been returned to the care of her family and friends; she could have seen her daughter again. Johnston could have let her live. But he chose, instead, to fasten his hands around LeAnne's neck and slowly strangle her to death in that field. She was conscious for up to two minutes as Johnston choked the life out of her. Johnston, 841 So. 2d at 353. She fought to live. While Johnston killed her, LeAnne scratched at his hands, trying desperately to free herself. She clawed at the ground, grabbing a handful of grass in her desperate attempt to escape. But Johnston wouldn't let her.

After he choked the last breath of life from LeAnne, Johnston grabbed her body by the legs and dragged her into a nearby retention pond. (The reason he did that became evident later when he told detectives they would not find any DNA evidence, hair, or saliva linking him to the murder, and they didn't.) Johnston, 841

5

So. 2d at 353.  Johnston left LeAnne in four inches of water, face down and nude, with her back and bruised buttocks exposed above the water level.  Before leaving her body and personal effects behind, Johnston stole her ATM card and a piece of paper with her pin number on it.

A man walking his dogs found LeAnne's body at 11:00 p.m and called 911 within minutes.  In addition to all of the injuries already described, the medical examiner found extensive bruising around her neck.  There were also scratches on her neck, which may have been caused by her own fingernails as she tried to free herself from Johnston's grip while he strangled her.  And there was that grass still clutched in her hand, bearing witness to how desperately she had struggled.  As the state trial judge would later write in describing LeAnne's final minutes of life: "the photograph of the grass clawed and grasped in her hands speaks louder than words that this victim fought for her life and was aware of her impending death after having been beaten with her own belt and sexually battered."

LeAnne's car, which Johnston had used to take her to the field, was found in the church's parking lot with the keys in the ignition.  Johnston, 841 So. 2d at 352.  One of his fingerprints was found on the outside of the car.  Id.  Some, but not all, of the groceries LeAnne had bought on the way home were in the back seat.  Id.  The milk and grapes she had bought were on the pavement of the parking lot where Johnston had grabbed her.

Soon after leaving LeAnne's body in the retention pond, Johnston used her ATM card at 10:53 p.m. to withdraw $500 from her bank account. At that same machine, he attempted three more withdrawals (two for $500 and one for $400) over the next two minutes, but those efforts were thwarted by the daily limit on withdrawals. Johnston drove to a second ATM machine in an effort to withdraw money there, but that failed again. He eventually returned to his apartment and threw some cash at the roommate who had argued with Johnston about money and yelled, "That's all you're getting from me, you son-of-a-bitch." Id. at 351.

The next morning, Johnston took LeAnne's card to an ATM machine at a McDonald's and withdrew another $500 from her bank account. He then tried twice to withdraw $500 more but was thwarted by the daily limit on withdrawals. After making an account balance inquiry at the same ATM and seeing that there was more money in LeAnne's account, he tried again to withdraw more cash — $100 and then $500 — but was again unsuccessful.

The night before, while Johnston was stealing money from LeAnne's bank account, her family learned that she had been murdered. The police told her parents, who had to tell Ansley. LeAnne's father said: "Telling a six-year-old granddaughter that her mommy went to be with Jesus and she will never see her again" was "not an experience that my wife and I would wish on anyone."

7

According to her father, LeAnne was "the love of [Ansley's] life."  She was a devoted mother who went to great efforts to be a positive influence on her young daughter.  She was active in the PTA at Ansley's school.  She baked cookies and cupcakes for kindergarten parties.  Even after a long day of work, she would prepare a home-cooked meal for Ansley, and help her with her homework, and play games with her, and read her a story, and give her a bath, and tuck her into bed.  That is the kind of mother she was.

Reverend Hartsfield, LeAnne's pastor, considered her a "model" for other parents in the church.  He recounted how involved she was in the church and the positive impact she had on other parishioners.  He described her as a "bright light of joy, energy, love, generosity and graciousness."  She was, he said, "an encourager and an inspiration to all of Ansley's teachers and the entire teaching and administrative staff" at her school.  Reverend Hartsfield recalled that just weeks before she was murdered, LeAnne had met with him to discuss how she could "get even more involved in the ministries of the church and how her life could be used in an even greater way to make a difference in this world."  She was: "Always improving.  Always looking to the interests of others; never settling for mediocrity or comfort."  That is the kind of person she was.

8

Dr. Dyer, LeAnne's boss, described being constantly reminded of how blessed he was to have her on his staff, and how his young patients, through the news of her death, were "exposed to a violent, life changing experience."

As Clarence the angel told George Bailey, each person's life touches so many other lives that when she is no longer around it leaves an awful hole.[1] About the hole that LeAnne's death left in the lives of her family and friends, a number of people spoke eloquently, none more so than her father. He described how he, her mother, and her younger brother "no longer hear the front door open" with a greeting from LeAnne "followed by the giggling of granddaughter Ansley." "No more nightly phone calls to discuss the day[']s happenings." "No more visits" to her apartment. "No more family outings." "Just a missing void" in "a close knit family." Her death left such an awful hole in the lives of so many people because that is the kind of person she was.

## II. JOHNSTON'S VIOLENT CRIMES AGAINST FIVE OTHER WOMEN

The same cannot be said of the man who murdered her. LeAnne Coryell was not the first woman Ray Johnston brutally attacked and sadistically beat, she was not the first woman he raped, and she was not the first woman he murdered. In fact, the 18 years that Johnston has been on death row without access to women

---

[1] "Each man's life touches so many other lives. When he isn't around he leaves an awful hole, doesn't he?" It's a Wonderful Life (Liberty Films 1946).

is the longest period of time in his adult life he has ever gone without violently brutally attacking one.

Between the ages of 19 and 20, Johnston assaulted three different women. In 1973, when he was 19 years old, he was charged with robbing an Alabama convenience store twice in one week and raping a store clerk during one of those robberies.

In 1974, he was charged with robbing and sexually assaulting a woman named Judy Elkins in Georgia as she was getting out of her car.  The indictment stated that he raped her, struck her with a belt — as he would strike Coryell with a belt more than 20 years later — and stole $15 cash and two credit cards from her at knifepoint.

That same year Johnston also attacked a woman named Susan Reeder in Alabama.  He followed her as she drove to her fiancé's apartment one night.  When she got out of the car, Johnston grabbed her, put one hand over her mouth and nose, and used his other hand to hold a six-inch hunting knife to her throat.  He told Reeder that if she made a sound, he would cut her throat.  He then put her in the back seat of her car, made her lie down, and started the car as she was terrified and crying.  Johnston drove to a deserted area where a number of houses were under construction.

10

Fearing that Johnston was going to rape her, Reeder told him that she was having her period, hoping that "maybe things wouldn't happen." Not believing her, Johnston ordered to undress and he touched her. When he found that she had lied to him, he got angry. He took his belt off and told Reeder, who was nude, to lean over the hood of her car. He beat her with his belt and said he was doing it because she lied to him. He whipped her with the belt from her "waistline down on the back side," just as he would Coryell two decades later. After beating Reeder, Johnston took her into the garage area of the partially built house. She tried to talk, to have a conversation, in an attempt to "make it all go away." But Johnston didn't want it to go away.

Still holding his hunting knife, Johnston tried to rape Reeder. When he was unable to perform, he "got mad and made [her] get on top." He then made "her body go in motion." This went on, Reeder estimated, for about two hours. After he finished raping her, Reeder begged him to let her go, promising him that if he let her live she would never tell anybody what had happened. He said he would take her to her fiancé's place — whether Johnston actually intended to do that or not is unknown — but he accidentally hit a curb and rendered the car undrivable, giving Reeder a chance to escape, which she managed to do.

For the robberies and rape he committed at a convenience store in Alabama in 1973 and against Susan Reeder in 1974, Johnston was convicted of two counts

11

of robbery and one count of rape.  He was sentenced to 10 years for each robbery count, to be served concurrently, and 10 years for the rape count.  For the crime he committed in Georgia against Judy Elkins in 1974, he was convicted of robbery by intimidation and sentenced to 15 years.

Johnston started serving the 15-year sentence in Georgia first, in September 1974, but after spending less than seven years in prison there he was released on parole and transferred to Alabama to serve out his ten-year sentences for the robbery and rape convictions.  In March of 1986, five years after he was transferred to Alabama, the Alabama Central Review Board recommended that Johnston not be granted parole because he was a "dangerous man to have released" due to his pattern and the length of criminal behavior.  Three months later, in June of 1986, the Alabama Department of Corrections granted him parole anyway.  He had served only five-and-a-half years of his sentence for the two robberies and rape.

Unfortunately, but not surprisingly, the Alabama Central Review Board's March 1986 assessment that Johnston was too dangerous to be released proved correct.  In January 1988, less than two years after his early release on parole, Johnston — this time in Jacksonville, Florida — broke into the house of Julia Maynard, a woman he didn't know.  When she came home one night, she entered through the foyer, went toward her kitchen and looked up.  She saw Johnston on

12

the stairwell, staring at her. He was wearing a jumpsuit, ski mask, and surgical gloves. Maynard was terrified.

She tried to run out, but Johnston grabbed her and backed her into the corner. He pulled out a knife, and while holding it to her throat told her that he was not there to hurt her but had been paid by somebody to attack her. He led her into her bedroom, "where he had made preparations" by removing all of her lingerie from her drawers and placing it on the bed. Then he took photos of her in various stages of dress and undress for 45 minutes. At one point, Johnston touched her "in the vaginal area."

When Johnston was finished with Maynard, he used her own panty hose to tie her to the bed, face down. He warned her that if she told anybody about what happened he would come back. Before walking out he placed the knife to her head, patted her, told her she was a nice lady, and said that it was too bad this had to happen to her. After Johnston left, she managed to free herself and call for help.

The police didn't catch Johnston right away. Unfortunately. Within six months he abducted another woman in Florida, Carolyn Peak, as she was getting out of her car at her apartment complex, just as he would abduct Coryell years later. Johnston held a knife to Peak's throat and told her that if she screamed he would cut her. He eventually ordered her to lie on the floor in the back seat, used an Ace bandage to tie her hands together, and drove away. When she asked him

why he was doing this to her, he said he would tell her later and swore that if she went to the police, "he would hunt her down and kill her."

Before Johnston could assault Peak, a police officer pulled the car over because the front headlight was out and the tag that had been propped up in the back window had fallen down. Following that stop, one thing led to another and it ended with Peak being rescued and Johnston being arrested. Inside the car the officer found a camera, surgical gloves, and a mask.

In addition to being charged with the crimes that he had committed against Peak, Johnston was also linked to the attack on Maynard and charged in connection with it. In combination, the charges included one count of armed kidnapping and two counts of burglary with assault. In September 1988, Johnston pleaded guilty to or was found guilty of all three charges and was sentenced to 18 years in Florida state prison.

While in prison, Johnston was disciplined for, among other things, lying and failing to report for work, as well as disorderly conduct. After he was transferred to a new prison in 1993, he was disciplined for a variety of offenses and was put into "admin confinement" at one point. The report about the disciplinary action that caused him to be put in admin confinement states that an inmate had reported another inmate's "plan to attack and rape a female staff member." Johnston was

14

released from prison in May 1996 even though he had served barely half of his sentence.

### III. JOHNSTON'S BRUTAL MURDER OF JANICE NUGENT

Within nine months after he was released from prison, Johnston invaded Janice Nugent's home in Florida, beat her with a belt, and slowly strangled her to death. Johnston v. State, 863 So. 2d 271, 274 (Fla. 2003). Within six months after doing that, he kidnapped, beat, sexually assaulted, and strangled to death Coryell, the victim in this case. We have already discussed in detail the crimes Johnston committed against Coryell. The crimes he committed against Janice Nugent are similar, although the circumstances leading up to the two crimes are somewhat different.

Janice Nugent was friends with a woman named Frances Aberle, who was dating Johnston in 1997. Id. at 275. All three of them were regulars at a bar called "Malio's." Id. Aberle told Johnston that she could no longer go to Malio's with him because Nugent did not want her to be with Johnston. Id. A short time later, Johnston attacked Nugent in her own home. Id. at 274. During the attack he inflicted what the medical examiner would describe as "three to five blunt impact" injuries on her buttocks and hips. Id. The medical examiner also found "within a reasonable medical probability, one or more of the patterned injuries on Nugent's buttocks were made by a belt." Id. Just like the injuries on Coryell's buttocks. He

15

also found that: "The other pattern type injuries could have been made by a belt or some other implement, possibly a vacuum cleaner hose." Id.  Johnston killed Nugent by strangling her with his hands. Id.  Just like he did Coryell.  The medical examiner explained that the "extensive bruising to Nugent's neck and shoulder area" showed that the strangulation "was not by constant, continuous compression," but "more of a manual throttling . . . meaning it was more pressure, release, pressure, release." Id.  In other words, it was done in a way that prolonged her suffering and terror.

Like LeAnne Coryell, Janice Nugent did not die without a fight. Id.  She had defensive bruising on her arms and hands and defensive fingernail injuries on her nose, indicating that she had struggled with Johnston and tried to pull his hands off her face. Id.  But she was not strong enough to fight him off.  After Johnston killed Nugent, he wrapped her body in a bed comforter and submerged her in water that he ran in her bathtub. Id. at 274, 275, 283.  Under the comforter her body was clad in only underwear and a bra. Id. at 274.

Several days after the murder of Janice Nugent, their mutual friend Aberle said to Johnston: "I just can't understand someone doing that.  Why?  No matter what somebody did, why somebody would do that." Id. at 275.  Johnston agreed and then said "Well, now there's no reason you can't go to Malio's with me." Id. Six months later, before he was charged with murdering Nugent, Johnston

kidnapped, beat with a belt, and strangled Coryell and put her body into water.[2] Much as he had Janice Nugent.

For all of the brutal crimes that Johnston had committed against the Alabama convenience store clerk in 1973, against Judy Elkins in 1974, against Susan Reeder in 1974, against Julia Maynard in 1988, and against Carolyn Peak in 1988, he was sentenced to a total of at least 43 years in prison. He served less than 20 years in all. Every time he was imprisoned for violently attacking women Johnston was released early, and every time he was released early, he used that leniency as an opportunity to violently attack other women, culminating in the murder of two women six months apart.

## IV. JOHNSTON'S ARREST FOR THE MURDER OF LEANNE CORYELL

The day after LeAnne Coryell's murder, the police publicized pictures captured by the ATM machines that Johnston had used to withdraw money from Coryell's account. Johnston, 841 So. 2d at 352. After learning that he had been identified as a suspect, Johnston went to the police station to give a voluntary statement. Id. He told Detectives Iverson and Walters that he had known Coryell for several weeks, that they were friends, and that they had gone out to dinner a

---

[2] Although Johnston beat and strangled Nugent to death six months before he beat and strangled Coryell to death, he was charged, convicted, and sentenced for the murder of Coryell first. See Johnston v. State, 863 So. 2d 271, 277 (Fla. 2003). And the jury that unanimously agreed Johnston should be sentenced to death for murdering Coryell heard nothing about his murder of Nugent. We include a description of that crime in this opinion for the sake of completeness.

few times.  Id.  He told the detectives that the night of the murder he had met her

for drinks at Malio's at 6:15 p.m. and the two of them had then gone to a restaurant

called Carrabba's about an hour later and stayed there until 8:30 or 9:00 p.m.  Id.

He also claimed that he had loaned Coryell approximately $1,200 over the course

of the several weeks that he had known her.  According to Johnston, before they

parted ways, Coryell gave him her ATM card and PIN number so that he could

withdraw $1,200 to repay the loan he had made to her.  Id.  He said that after he

left Carrabba's restaurant he went home, changed clothes, went jogging, and then

withdrew $500 from her account.  Id.  He said he withdrew another $500 the next

morning.  Id.  The ATM photographs and records showed that he also

unsuccessfully attempted to withdraw more cash from her account three times the

night of the murder and four more times the next day.

       After Johnston admitted that he withdrew the $1,000 from Coryell's

account, the detectives arrested him for grand theft and read him his Miranda

rights.  Then one of the detectives confronted Johnston with the fact that Coryell

did not leave work until 8:38 p.m.  Johnston's response was that one of her co-

workers must have clocked out for her because he was with her at that time.  He

was, however, unable to provide the names of anybody who could corroborate that

he was out with Coryell that evening.

18

The detectives then told Johnston that while executing a search warrant at his apartment earlier that day, they found his tennis shoes and they were completely wet. He tried to explain the wet shoes by claiming that he jumped into the hot tub, shoes and all, to wash off after jogging. During the interview, one of the detectives noticed scratches on Johnston's wrist. When asked about those scratches, Johnston claimed that he had been moving some boxes earlier at work and that he had also fallen while jogging. The detectives asked him several times whether he was involved in Coryell's death. He responded that they would not find any DNA evidence, hair, or saliva linking him to the crime. Johnston, 841 So. 2d at 353. He had taken care to wash that evidence off Coryell's body by putting it into the retention pond, but he did leave his fingerprint on her car. See id. at 352.

While he was in jail awaiting trial, Johnston wrote to his pen pal, Laurie Pickelsimer, and asked her to provide a false alibi for him. Id. Johnston asked her to tell his attorneys that on the night of the murder the two of them were working out in the gym at his apartment complex from 9:00 p.m. until about 10:30 p.m., except for a short time when he walked back to his apartment to get them a drink. Id. He told Pickelsimer in the letter that if she would lie for him she might get some money from his family. She refused and later told the prosecutor about Johnston's letter.

## V. THE STATE COURT PROCEEDINGS

### A. The Guilt Stage of the Trial

After a lengthy guilt stage trial with 56 witnesses, and after hearing overwhelming evidence against Johnston, a Georgia jury found him guilty of these crimes against LeAnne Coryell: first degree murder, kidnapping, robbery, sexual battery, and burglary of a conveyance with assault.  See Johnston, 841 So. 2d at 351–53.

### B.  The Sentence Stage of the Trial

During the sentence stage that followed, the State introduced testimony from three of the victims Johnston had violently assaulted: Susan Reeder, Julia Maynard, and Carolyn Peak, all of whom testified in detail about how Johnston had attacked them.  Id.  The State also called Dr. Vega, the medical examiner who conducted Coryell's autopsy.  Id.  The jury had already heard during the guilt stage the details of Johnston's brutal attack and murder of Coryell.  See Part I, above.  At the sentence stage the State added to that evidence more testimony from Dr. Vega. Johnston, 841 So. 2d at 353.  Among other things, he told the jury that Coryell was likely conscious at the time Johnston raped and beat her, and that she was likely conscious for up to two minutes while Johnston strangled her.  Id.

The State called three people to give victim impact evidence: Coryell's father, Dr. Dyer, and Matthew Hartsfield (her pastor).  Id.  We have already

20

summarized their testimony about how Coryell's death had affected her family, her colleagues, and her parish.  See Part I, above.

Defense counsel called a number of witnesses to provide mitigating evidence.  Four mental health experts: Dr. Frank Wood, Dr. Diana Pollock, Dr. Michael Maher, and Dr. Harry Krop, testified about Johnston's mental health problems.  Id. at 353–54.  Three of them testified that in their opinion he had frontal lobe brain damage, which impaired his decision-making.  Id.  But Dr. Pollack admitted on cross-examination that despite conducting an MRI and a recording of brain waves (EEG), she did not find any abnormal structural defects, lesions, tumors, or similar abnormalities in Johnston's brain.  And Dr. Maher testified, that in his opinion, Johnston was aware of what he was doing, including "the likely result of his actions," when he murdered Coryell.  He also testified that Johnston did not suffer from schizophrenia or split personality disorder.  Dr. Krop testified that Johnston had an IQ of 104 and performed within or above normal limits on memory, speech, and information reception tests.

The defense also called Sara James (Johnston's mother), Susan Bailey (one of his ex-wives), and Rebecca Vineyard (his younger sister) to testify on his behalf. Johnston's mother talked about his positive characteristics and good behavior, and she begged the jury not to execute him.  Id. at 354.  His ex-wife testified that while they were married Johnston cooked, cleaned, and took an active role in her two

21

daughters' lives, and that he was a model husband.  Id.  She also said that little things could make him suddenly angry and cause him to "snap."  Vineyard told the jury that since Johnston was a child, he had tried too hard to win other people's approval and could not handle being rejected or feeling humiliated.  Id.

Five other people testified on Johnston's behalf.  Three of them — Gloria Myer, William Jordan, and John Field — were people who had worked in prisons where Johnston served time.  They testified about how he was a good worker, followed instructions, got along with other inmates, and did not cause any disciplinary problems.  Id.  John Walkup, Johnston's probation officer, told the jury that he had recommended that his probation be ended early because Johnston had a good family life, had a good job, reported regularly, and paid his fees.  Id. Finally, Bruce Drennan, the president of the Brandon Chamber of Commerce, told the jury that Johnston represented a company that was a member of the Chamber. Id.

Johnston decided to testify.  Id.  He admitted to killing Coryell.  Id. According to his testimony, on the night of the murder he had just gotten out of the hot tub and was walking back to his apartment when he saw Coryell pull into the parking lot and begin taking groceries out of her back seat.  Johnston walked up to her and asked if he could help.  Coryell either didn't respond or "just said hi or

hello" and didn't take him up on his offer. So he "grabbed her arm" and asked again. What happened next, Johnston described as follows:

> And I don't know, Joe,[3] it was like I reached for her and I was going to grab both of her shoulders, but I grabbed her by the neck and it didn't seem like it took but just a short time. I mean, it wasn't — I don't even remember her — I don't even remember her reaching for me, it didn't seem like. It took just a short time.

When defense counsel asked Johnston why he put his hands around Coryell's neck, Johnston said: "I wanted her attention and I didn't get it and I just — I just wanted her attention, and I didn't get it and I grabbed her. It wasn't — I just grabbed her around the neck, Joe."

Johnston then explained that after he had strangled Coryell, she "was kind of bent," "her legs just gave out and she hit her lip on the edge of the door . . . and then her chin hit the ground." Johnston said he got down, rolled her over, and saw that her eyes and mouth were open. He "tried to breathe in her mouth and she just laid there." So he picked her up and put her in the back seat of her car. He said that he thought he "broke her neck because" when he had his hands around her neck, he felt something "push in."

According to Johnston, once he had Coryell in her car, he got into the front seat and drove out of the apartment complex. He decided not to take her up to her apartment because "there are security things" in the apartments and he didn't know

---

[3] Joe was the name of Johnston's sentence stage attorney.

23

the code to hers, and because he "didn't want to be seen." Instead, he took her to the field next to St. Timothy's Church. When he pulled into the field, he "got in the back seat and [he] put her head in [his] lap." Her eyes were still open and she wasn't breathing. He held her face, and he was "just so mad" and "squeezed her head." When asked why he was so mad, Johnston said: "Cause I walked up to her and I just — I don't know. She just didn't respond to me, Joe."

Johnston testified that he lifted Coryell's body and sat it up by a tree. He explained that he was still "angry." He said: "I can't — I don't know how — you just have to feel it. You just have to feel it. It's like you know exactly what you're doing; you're aware of exactly what you're doing, you know what's going on around you; you just can't stop." Johnston said that after he sat Coryell by the tree, he took off all her clothes and scattered them on the ground. He picked up her right leg and "dragged her" away from the tree. Then he lifted up her leg and "kicked her . . . . [i]n her crotch." After that he struck her with her belt "about four" times.

When asked why he did those things to Coryell's body, Johnston claimed that he wanted to "make her look like she was assaulted." He said: "I'm trying to make her look like, when somebody finds her at the church, that she had been assaulted and yet cover my ownself up."

Johnston recounted how he next "dragged her to the pond," "laid her down," and "rolled her on her stomach." Then he "laid down there with her in the dirt on [his] stomach." He gave no explanation for that. After a few minutes went by, a car passed through the church parking lot, so Johnston "took off running." He ran to a pool, sat on the edge, and "tried to get the dirt off [his] legs." Then he hid his shirt behind some bushes and ran home. Once inside, he washed his shoes off in the bathtub, took a shower, and put his shoes in the dryer.

Johnston said that after he was dressed in new clothes, he went back to the church parking lot to "check on her to see if anybody found her yet." When he pulled in, he stopped at Coryell's car, reached in, and took her purse. Inside he found a wallet and an address book. He said he may have found "a brush or something" too. Johnston took Coryell's ATM card from her wallet and her PIN from her address book.

Johnston recounted that he immediately drove to the Barnett Bank ATM machine and, using Coryell's ATM card, withdrew from Coryell's account the limit of $500. Then he drove to another bank and tried to use the card there, he explained, "to see if there was any transactions left to be made" for that day. There weren't, so he left. When asked if he knew that his picture was being taken at the ATM machines, he said he did. He added: "I think at that time, like every other time, it's like — it's like you do this stupid stuff and then you sit down and you say

25

what have I done.  Then you got to hide yourself.  You got to hide what you've done.  You got to cover it up.  And I think — I think when I showed my — I think I wanted to show my picture."

During cross-examination, the prosecutor asked Johnston: "You're telling this jury that you wanted to get Leanne Coryell's attention and you didn't get it, so you killed her; is that what you're telling them?"  Johnston said: "Yes, sir."  The prosecutor rephrased the question: "You killed her because she didn't respond to your hello; is that what you're telling this jury?"  Johnston again said, "Yes, sir."

The prosecutor also asked Johnston about the series of lies that he had told the police and the media following the murder.  The prosecutor asked: "You lied to Detective Walters . . . that you had loaned Leanne Coryell twelve hundred dollars over several, several weeks, didn't you?"  Johnston replied: "Yes, sir, I did."  The prosecutor asked: "And you lied to Detective Walters when you said Leanne Coryell voluntarily gave you that ATM card at Carrabba's Restaurant to pay you back this money, didn't you?"  Johnston replied: "Yes, sir, I did."

The prosecutor asked: "After you were arrested, you not only lied to Detective Walters, you lied to all the television stations you called up, didn't you?"  Johnston replied: "Yes, sir, I lied to everyone."  The prosecutor asked: "You made it a point to call the stations and tell them that you had known Leanne Coryell for

26

several weeks, didn't you?" Johnston replied: "Yes, sir." The prosecutor asked: "And that was a lie, obviously, right?" Johnston replied: "Yes, sir."

The prosecutor continued, asking: "And you lied to the television stations when you told them that you couldn't kill such a sweet, sweet girl?" Johnston replied: "Yes, sir." The prosecutor asked: "And you lied to the television stations when you told them that you had gone dancing with her at Malio's?" Johnston replied: "Yes, sir." The prosecutor asked if Johnston had tried to get his pen pal to lie about his alibi in front of the jury. Johnston replied: "Yes, sir." The prosecutor asked if Johnston "wanted to manipulate the media" to "get [his] defense out." Johnston replied: "Yes, sir."

During cross-examination, Johnston also admitted to attacking Susan Reeder. He admitted that he ambushed her at knifepoint, drove her to an isolated area, made her undress, beat her with a belt, and raped her. When asked if he was acting on impulse during his attack, Johnston said: "It's the same old thing, same old story, same old action." When asked if there were a lot of similarities between his attack of Susan Reeder and his murder of Coryell, Johnston said: "They're all the same. They're all the same old things."

Johnston also admitted to attacking Julia Maynard. He admitted that he broke into her house, took photographs of her, and tied her up. When the prosecutor asked him if he had to climb through a window to get in, he explained

27

that "you do whatever it takes because you don't have the power to stop whatever it takes."  When asked why he wore a mask and gloves, he said: "Again, it goes back to the means, that you do the things that you — that it takes to do whatever it is that you're going to do.  If it's a mask, if it's gloves, if it's clothes, if it's a car, if it's hair, it doesn't matter."

Johnston also admitted to attacking Carolyn Peak.  He admitted that he ambushed her as she was getting out of her car.  And when asked, "Much like you did Ms. Coryell and much like you did Ms. Reeder, right," he replied, "Same old thing."

The jury unanimously recommended that Johnston be sentenced to death. Johnston, 841 So. 2d at 355.  After holding a Spencer hearing,[4] the trial court found the following aggravators: (1) Johnston was previously convicted of violent felonies; (2) the crime was committed while Johnston was committing sexual battery and kidnapping; (3) the crime was committed for pecuniary gain; and (4) the murder was especially heinous, atrocious, or cruel.  Id. at 355 n.3.  The court found one statutory mitigator:  Johnston's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of law was substantially impaired.  Id. n.4.  It also considered all of the nonstatutory mitigating

---

[4] "A Spencer hearing occurs after the jury has recommended a sentence but before the judge imposes a sentence."  Kormondy v. Sec'y, Fla. Dep't of Corr., 688 F.3d 1244, 1271 n.29 (11th Cir. 2012) (citing Spencer v. State, 615 So. 2d 688, 691 (Fla. 1993) (per curiam)).

28

circumstances the defense offered and in its order indicated the weight, if any, it

gave each alleged mitigating circumstance. Sentencing Order, State v. Johnston,

Case No. 97-13379 (Fla. Cir. Ct., Crim. Div. March 13, 2000) (available in

Johnston, 841 So. 2d 349, Appeal Record, Ex. A-18 at 1833–39).[5] The court

followed the jury's recommendation and imposed the death penalty. Id.

---

[5] The State trial court's order, which it read into the record, stated: "The defense offered and this Court considered each of the following factors:  (A) The time passing between the decision to cause the victim's death and the time of the killing itself was insufficient under the circumstances to allow Defendant's cool and thoughtful consideration of his conduct.  This was given no weight.  (B) It is unlikely that the Defendant would be a danger to others while serving a sentence of life in prison.  This is given no weight.  (C) Defendant has shown remorse.  This is given slight weight.  (D) The Defendant did not plan to commit the offense in advance, it was an act of a man out of control, and in an irrational frenzy.  This was given no weight.  [E] The Defendant has a long history of mental illness.  His mother and sister testified about his hospitalization as a child at the Hillcrest Institution in Alabama, where as a teenager he received electro shock treatments and was thought to be schizophrenic.  This was given slight weight.  (F) As testified to by Dr. Michael Maher, the Defendant suffers from a disassociative disorder.  This was given no weight.  (G) The Defendant suffers from seizure disorder and blackouts, but there is no evidence that any such disorder contributed to this crime.  This was given no weight.  (H) The murder was the result of impulsivity and irritability.  This was given no weight.  (I) The Defendant is capable of strong loving relationships.  His mother, sister and former wife testified at length as to his ability to love and be loved.  He lavished affections on his ex-wife, Susan Bailey.  She believed they would have still been together if not for his mental problems.  This was given slight weight.  (J) The Defendant is a man who excels in a prison environment. Chaplain Fields and Gloria Myers established this in mitigation, and Dr. Maher also testified that he would do well in the structured environment of prison.  This was given slight weight.  (K) The Defendant could work and contribute while in prison, as he has done in the past.  He could teach and be an example to other prisoners not to follow the same life-course he has.  This was given slight weight.  (L) The Defendant has extraordinary musical skills and is a gifted musician, according to the testimony of Chapl[a]in Fields.  This was given no weight.  (M)  The Defendant obtained additional education from the University of Florida while he was in prison in 1992. This was given no weight.  (N) The Defendant served in the United States Air Force and was honorably discharged in 1974.  This was given slight weight.  (O) The Defendant refused workman's compensation and wanted to work for a living despite constant headaches and seizures he was having.  This was given no weight.  (P) During the time that the Defendant was on parole, he excelled and was recommended for early termination, showing a propensity and desire to do well in the world.  This was established by his former probation officer.  This was given slight weight.  (Q) The Defendant was a productive member of society after his release from prison and took care of his wife and daughter with a good job and supported the household.

Johnston appealed his convictions and death sentence to the Florida

Supreme Court.  He contended that one of the jurors from his trial should have

been disqualified and that his trial counsel was ineffective for not individually

questioning jurors who had exposure to pretrial publicity.  See Johnston v. State,

841 So. 2d 349, 355–58 (Fla. 2002).  He also contended that his death sentence

was invalid because the trial court did not instruct the sentence stage jury about, or

address in its sentencing order, the mitigating circumstance of "extreme mental or

emotional disturbance at the time of the offense."  Id. at 358–61.  The Florida

Supreme Court rejected each of those contentions, and it added that his death

sentence was proportional to the circumstances of his crime.  Id. at 360–61.

Johnston then filed a motion for state post-conviction relief.  He raised

twelve claims, most of which asserted ineffective assistance of counsel.  The

Florida circuit court denied relief on all of those claims.  See Florida v. Johnston,

---

This was given slight weight.  (R) When notified that the police were looking for him, he did not flee, but turned himself in and otherwise offered no resistance to his arrest.  This was given slight weight.  (S) The Defendant demonstrated appropriate courtroom behavior during trial.  This was given slight weight.  (T) The Defendant has tried to conform his behavior to normal time after time, but has been thwarted by his mental illness and brain disfunction.  This was given slight weight.  (U) The Defendant has a special bond with children, as testified to by his sister and ex-wife.  This was given no weight.  (V) The Defendant has the support of his mother and sister who will visit him in prison.  This was given slight weight.  (W) The Defendant can be sentenced to multiple consecutive life sentences in addition to the sentence for first degree murder.  He will die in prison and the death sentence is not necessary to protect society.  This was given no weight.  (X) The totality of circumstances do not set this murder apart from the norm of other murders.  This was given no weight.  (Y) Defendant might be subject to Jimmy Ryce Act involuntary commitment.  This was given no weight.  (Z) The Defendant offered to be a kidney donor for his ex-wife.  This was given slight weight."

Case No. 97-13379 (Hillsborough Cty. Cir. Ct. Feb. 5, 2009). Johnston appealed to the Florida Supreme Court, and while that appeal was pending, he also filed a state habeas petition with it. The Florida Supreme Court affirmed the denial of his state post-conviction motion and denied his state habeas petition. Johnston v. State, 63 So.3d 730 (Fla. 2011).

## VI.  THE FEDERAL DISTRICT COURT PROCEEDINGS

Having failed in state court, Johnston filed a 28 U.S.C. § 2254 petition in the Middle District of Florida, and then amended it. In the amended petition he claimed that he was entitled to habeas relief on grounds of juror misconduct, defects in the jury instructions and in the sentence order, and because of ineffective assistance of counsel. The district court denied his petition, his later his Rule 59(e) motion to alter or amend the judgment, and his motions for a certificate of appealability.

## VII. DISCUSSION

We granted Johnston a certificate of appealability on two issues: (1) whether he was denied effective assistance of counsel because his attorneys failed to investigate and call Diane Busch as a witness at the guilt stage, and (2) whether he was denied effective assistance of counsel because his attorneys failed to investigate and call Diane Busch as a witness at the sentence stage. We will

31

begin our discussion of those issues with a description of the relationship between the two of them.

A. The Facts Involving Diane Busch and Johnston

Diane Busch was a friend of Johnston for a short period of time. After meeting in the beginning of June 1997, they began seeing each other socially. Two weeks later, Busch fell ill and was admitted to the intensive care unit for treatment. She was in the hospital for four months. Johnston continued seeing Busch for a few weeks while she was in the hospital, but their relationship ended shortly before he murdered LeAnne Coryell in August of that same year.

After the police arrested Johnston on August 21, Detective Taylor interviewed Busch at the hospital four days later. According to Detective Taylor, she told him that she had started dating Johnston after meeting him at church, and that he was "very polite and nice to her." She recounted how he was "overly anxious to please, even offering to watch her children for her," and that she had called Johnston when she suffered an asthma attack and needed to go to the hospital.

Things changed, however, after Busch was admitted to the hospital. Johnston began acting possessive of her and became "verbally abusive to her family and the nurses." When Busch "finally realized how out of control things

32

were getting, she requested that Johnston not be permitted to enter her ICU room any longer" and asked the hospital staff to stop accepting his phone calls to her.

After interviewing Busch, Detective Taylor interviewed her mother and sister and three of the nurses who had treated Busch. They told him that Johnston was controlling, would not abide by hospital rules, had threatened the nurses, had threatened Busch's parents, and had threatened her friends. Each nurse recalled instances in which Johnston had made sexual comments or advances toward Busch while she was heavily medicated and they were attempting to treat her. One of them told Detective Taylor how she had once found Johnston on top of Busch in the hospital bed while the medical alarms were going off, and when the nurses tried to attend to her, Johnston wouldn't allow them to do it. Only a nurse's threat to call hospital security got him to leave. All three nurses told the detective that they were uncomfortable around Johnston, and two of them were so disturbed by his behavior that they asked hospital security to walk them to their cars at the end of their shifts.

Busch's mother told Detective Taylor that she had met Johnston for the first time at the hospital and was "very upset over his behavior, his language, and his treatment of Diane and the nurses." She told him that Johnston had used Busch's car while Busch was in the ICU. She also told him about finding in the car while Johnston was using it a bag containing "a pair of surgical gloves, an elastic type

33

wristband, and a knife . . . with an approximate 2 [inch] pointed blade." Busch's mother had filed a report with the Sheriff's Office about the bag and its contents, but the Sheriff's Office took no action after determining that "no crime had been committed."

Diane Busch's sister told Detective Taylor that Johnston took Busch's "vehicle without anyone's permission and that Diane was very heavily medicated at the time." The family "had to request the vehicle back from Johnston." She remembered that in response Johnston "threw the keys at her parents." Three weeks later, Detective Willette interviewed Busch over the phone. She told him that Johnston had used her car while she was in the hospital, but that "he did not have permission" to do so.

After those interviews, the State listed Diane Busch as a witness who might have information relevant to the case. It gave that list, along with a copy of the detective reports, to the defense team before trial. Defense counsel gave those documents to Johnston, and Johnston reviewed them and gave his attorneys written notes about them.

In those notes Johnston wrote that there was "[a] lot of history" between himself and Busch, and she "need[ed] to be interviewed by herself." He explained that he "stayed with her for 15 days and nights and saved her life 3 times." He claimed that while he was "very protective of her" in the hospital, it was "not to the

34

point where [he] was rude to others." He also noted that the "deposition [he] gave for her divorce [would] more closely explain the role [he] played in her life." He listed her phone number and added her name to two lists of potential witnesses. One list was: "Witnesses to the fact that we drove their cars on dates and not mine. The same as I did w/ Leanne." The second list was: "Women I had personal relationships with."

Johnston testified during state post-conviction proceedings that he didn't just give his attorneys notes about Busch, he discussed her with his defense team several times before trial. He recalled telling them that he "protected her and her possessions," that he "took ten thousand dollars of hers" and "watched over it in her house," and that he "gave all of [it] back to her when the proper time came." Although there are no records corroborating those discussions, one of his former attorney's handwritten notes reflect that Johnston showed her "the depo from Diane Busch's divorce/custody case," told her that "he had been with Diane when she was ill" and "helped her out," and said that he was "trying to have positive relationships [with] women" and "wanted to overcome his past behavior."

Neither of the attorneys who represented Johnston at trial (one was lead counsel during the guilt stage and the other during the sentence stage) contacted Diane Busch to investigate whether she would be a favorable witness. Johnston's lead attorney at the guilt stage said he could not remember who Busch was or

whether he ever spoke with her.  And Johnston's lead attorney at the sentence stage stated that because Johnston never told him about Busch, he did not attempt to contact her.

During state post-conviction proceedings, Busch testified that had defense counsel reached out to her, she could (and would) have testified on Johnston's behalf.  She denied that Johnston was verbally abusive to her family and claimed not to recall telling the nurses or the detectives that he was.  She also claimed that she did not recall telling anybody that she thought things were "getting out of control" or requesting that Johnston be banned from visiting or calling her in the ICU.

Instead, Busch testified in the state post-conviction proceeding that while she was in the hospital, Johnston "managed all of [her] medical care" and that "[h]is role was nothing short of a caring, loving individual wanting the best possible care for the success of recovery."  She even went as far as crediting Johnston with saving her life.  She explained that "nobody in the hospital would listen to the pain [she] was in" and that "by the minute [she] was failing." Johnston "was very, very concerned and protective and listened to everything that [she] said."  He was "the only one that shook people up and gave attention to" the fact that her "organs were shutting down."  She claimed that he "got [her] to another hospital and orchestrated the doctors to coordinate what [was] going on,"

and "complete[ly] manage[d]" the situation. "Without him," she thought, "[she] would have died."

Busch also testified that on her second day in the ICU, she asked Johnston to help her remove $10,000 from her home so that her estranged husband could not take it. Johnston agreed and went to Busch's house with one of her friends. He retrieved the money from under Busch's mattress, counted it, and gave it to the friend, who immediately deposited the money into her own bank account for safekeeping. Busch added that while she was in the hospital, Johnston had access to her vehicle, her credit cards, and her home, and he never stole from her.

Busch acknowledged that her family made her cut off all contact with Johnston when they became involved with her care and that they retrieved her personal belongings from him. But she asserted that her family took those steps not because they were upset with Johnston's behavior in the hospital, but because they found out about his violent past and did not want him around her. Busch also testified that while watching the news in the hospital, she saw that law enforcement was looking for Johnston in connection with the Coryell murder (based on an ATM photo of him) and in response she called the Crimestoppers number to identify him.

During cross-examination, the State asked Busch about some statements she had made to either the prosecutor or detectives before trial about a sexual encounter she had with Johnston:

Q: [D]idn't you [state] that you were shocked and frightened either during or as a result of Mr. Johnston's behavior during [a] sexual encounter?

A: I don't recall saying that. But I was in an 18-year stale marriage, and the encounter was different.

Q: And do you recall [stating] that the defendant used phrases that shocked you such as, excuse my language, bitch and fucking bitch?

A: I don't recall exactly.

Q: Do you recall indicating that the defendant turned into a mean character during that encounter?

A: I don't recall.

Q: Do you recall [stating] in words or substance, because I don't know if this is a direct quote or my interpretation as I'm writing my notes, that the defendant either loved or was enamored or obsessed with the buttock area?

A: I don't recall.[6]

On redirect, Johnston's post-conviction attorney asked Busch if she remembered "any instance when Ray Lamar Johnston frightened [her] in any

---

[6] When asking Busch about these statements, the prosecutor said he was reading from his notes about her pretrial deposition. But neither his notes, nor a transcript of any pretrial deposition, is in the record. During oral argument before us, the attorney for the State said that it is unlikely that there ever was a pretrial deposition, and that the prosecutor was probably reading from notes about a pretrial interview of Busch by the police.

38

manner or mistreated [her] in any way." She answered, "[n]o." Later Johnston's attorney asked if there was anything that she had "left out" that she "wish[ed] to comment on." She responded, "As I sit here in reflection of the encounter that I had with Mr. Johnston ten years ago sexually, to this date, that encounter is not unusual. I feel that it's kind of the norm of a lot of gentlemen, so I just wanted to add that."

### B. The Two Claims Relating to Diane Busch

In his state post-conviction motion, Johnston claimed that it was ineffective assistance of counsel not to investigate what Diane Busch could testify to and not to call her as a witness at both the guilt and sentence stages of trial. As for the guilt stage, he claimed that Busch's testimony about how he did not steal the $10,000, her credit cards, or her car would have undermined the State's theory that he murdered LeAnne Coryell in part for monetary gain. And as for the sentence stage, he claimed that Busch's testimony about how he cared for her and saved her life in the hospital would have provided powerful non-statutory mitigating evidence and swayed the jury not to impose the death penalty.

The Florida trial court rejected both claims and denied Johnston's post-conviction motion. The Florida Supreme Court affirmed. Johnston v. State, 63 So. 3d 730, 741 (Fla. 2011). It held that Johnston's trial counsel was not deficient in failing to investigate and call Busch as a witness "[g]iven the slight value of her

39

proffered testimony and the likelihood that it would have opened the door to the prosecution's highly damaging cross-examination and impeachment evidence." Id.

We review a state court's denial of a claim on the merits only to determine if the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

There are two showings that a petitioner must make to have a valid ineffective assistance of counsel claim: deficiency and prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). Where a state court denies an ineffective assistance of counsel claim for failure to show that counsel performed deficiently, without reaching the prejudice issue, we may skip over the deficiency issue and deny the claim if we determine for ourselves that the petitioner has not established prejudice. See Rompilla v. Beard, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the Strickland claim de novo."); Reaves v. Sec'y, Fla. Dep't of Corr., 872 F.3d 1137, 1151 (11th Cir. 2017); Ferrell v. Hall, 640 F.3d 1199, 1224 (11th Cir. 2011).

40

That is the course we will follow here.  We will not pass on the Florida Supreme Court's decision that counsel did not perform deficiently regarding Diane Busch as a potential witness at the guilt or sentence stage because, even if they did, Johnston cannot show prejudice.  That is true as to both stages.

To show prejudice, the petitioner must establish that his counsel's errors were so serious that they deprived him of a fair trial or sentence proceeding, or in other words, one whose result is reliable.  Strickland, 466 U.S. at 686–87.  That occurs if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  And "reasonable probability" means "a probability sufficient to undermine confidence in the outcome."  Id.  In gauging that, we must consider "the totality of the evidence before the judge or jury."  Id. at 695.

1.  The Guilt Stage Ineffective Assistance of Counsel Claim

Johnston also contends that if trial counsel had called Diane Busch at the guilt stage, there is a reasonable probability that the jury would have found him not guilty of murdering LeAnne Coryell.  See Strickland, 466 U.S. at 694–95.  Johnston cannot make that showing.

We begin by noting an intriguing question arising from the fact that during the sentence stage Johnston took the stand and under penalty of perjury confessed that he had murdered Coryell.  (He hoped that strategy would make a favorable

41

impression on the jury and help him escape a death sentence, but it did not.) The question is whether his confession at the sentence stage washes back to the prejudice determination regarding his guilt stage ineffective assistance of counsel claim he is pursuing. The prejudice inquiry, after all, is "focuse[d] on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

One could certainly argue that a guilty verdict is not an unreliable result and a conviction is not fundamentally unfair where the defendant has taken the stand in a later stage of the same trial and under oath voluntarily confessed that he is guilty of the crime. As intriguing as that question is, we have no need to answer it. Even disregarding entirely Johnston's sentence stage confession, he has not carried his burden of establishing that if Diane Busch had testified at the guilt stage, there is a reasonable probability that the jury would not have convicted him of murdering Coryell.

This claim of ineffective assistance of counsel at the guilt stage is related to the prosecution's theory at trial that Johnston's motive for murdering Coryell was that he needed money, which he obtained by using her ATM and pin number after he killed her. Busch testified at the state post-conviction hearing about Johnston helping her get $10,000 from her house while she was bedridden in the hospital.

42

Johnston argues that her testimony undermines the motive the prosecution put forward because if he had been desperate for money he would have stolen that $10,000. Motive "is not an essential element of the crime of first degree murder and a person may be convicted of this crime even if no motive is established." See Bedoya v. State, 779 So. 2d 574, 578 (Fla. 5th DCA 2001). In any event, the testimony that Busch could have given as a guilt stage witness would not have refuted the prosecution theory that Johnston needed money and killed Coryell to get it.

According to Busch, in order to keep her estranged husband from getting it, she wanted $10,000 that she had hidden under her mattress put into a bank. She could not move the money because she was in the ICU. So she asked Johnston and a woman who was a friend of hers to do it for her. They agreed and went to Busch's house. Johnston got the money from under Busch's mattress, counted it, and gave it to Busch's friend who was standing there, and who immediately deposited the money into her own bank account for safekeeping. Busch added that while she was in the hospital, Johnston had access to her vehicle, her credit cards, and her home, but he never stole from her.

Testimony that Johnston did not steal the $10,000 from Busch would not have persuaded a jury that he did not need money. First, when Johnston had temporary access to Busch's money, credit cards, and car, he was trying to

43

establish a romantic relationship with her.  That gave him an incentive not to steal from her; had he stolen from her, Busch surely would have broken things off with him, not to mention reported him to law enforcement.  By contrast, Johnston was not having a relationship with Coryell; they were strangers, and he had no incentive to be nice to her.

Second, even if Johnston had been willing to jeopardize his budding relationship with Busch by stealing from her, he would have known that he could not get away with it.  Busch sent Johnston to get the $10,000 cash and to see that it was deposited in a bank.  If he had stolen any of it she would have known.  Johnston was accompanied by another friend of Busch's who stood by as he removed the money from under the mattress and counted it.  She would have known if he had stolen it and would have reported the theft to Busch or the police, or both.  There is no way Johnston could have prevented Busch from knowing.  Busch, after all, had sent Johnston and her friend to her home together while she stayed in the ICU where she was surrounded by hospital staff.

As for Busch's credit cards and her car, she and her family knew that Johnston was driving her car while she was in the hospital, and Busch knew that he had access to her credit cards.  Had he stolen either the credit cards or the car, he would have been identified as the thief in no time.  The point is that the fact Johnston did not steal from a woman he had a relationship with when he almost

44

certainly would have been caught does not mean that he did not have a need for money that motivated him to rob and kill a stranger when he had a chance of not getting caught.

Besides, the evidence proved beyond any doubt that Johnston did badly need money. In 1997, the year in which Coryell was murdered and robbed, Johnston was "in and out of work." That year alone he had written 53 insufficient funds checks, resulting in $1,537 in fees. The month before the crime Johnston had prepared an affidavit for use in his divorce proceeding stating that his monthly expenses ($1,709) exceeded his total monthly income ($1,680). One of his roommates had to loan him money. On the night of the murder, when Johnston had only $53.55 in his bank account, one of his roommates had dunned him for the $163.92 he owed for his share of the cable and phone bills. After Coryell was murdered and her ATM card was used to get cash, Johnston paid the roommate in cash part of what he owed.

It is undisputed that Johnston used Coryell's ATM card to obtain $500 within an hour and a half after she was murdered. And he unsuccessfully attempted to use it to make three more withdrawals that night, all within minutes after successfully withdrawing the $500. It is also undisputed that at 7:27 a.m. the morning after the murder Johnston used Coryell's ATM card to withdraw another $500 from her bank account. And he then used the ATM card four more times in

45

the next four minutes that same morning in unsuccessful attempts to get $500 more, then $500 more, then $100 more, and then $500 more. Johnston was desperate for money. Nothing that Diane Busch could say about Johnston not stealing from her two months earlier could change the fact that he had a motive for robbery on the night Coryell was murdered. There is no reasonable probability that if Busch had testified the jury would not have convicted Johnston of the murder.

## 2. The Sentence Stage Ineffective Assistance of Counsel Claim

The theory underlying Johnston's sentence stage claim is that Diane Busch would have been a powerful mitigating witness because she would have testified about their brief relationship and spoken in glowing terms about everything that he did for her while she was hospitalized. In her state post-conviction testimony she described how, while she was in the hospital, Johnston "managed all of [her] medical care" and "[h]is role was nothing short of a caring, loving individual wanting the best possible care for the success of recovery." She even credited Johnston with saving her life. She explained that "nobody in the hospital would listen to the pain [she] was in" and that "by the minute [she] was failing." Johnston, she believed, "was very, very concerned and protective and listened to everything that [she] said." He was "the only one that shook people up and gave attention to" the fact that her "organs were shutting down." She claimed that he

46

"got [her] to another hospital and orchestrated the doctors to coordinate what [was] going on," and "complete[ly] manage[d]" the situation. "Without him," she thought, "[she] would have died."

Johnston argues that, in spite of all of the violent crimes he has committed against women throughout his adult life, culminating in his brutal murder of Coryell, Busch's favorable testimony could have turned everything around for him in the sentence stage.

To decide whether there is a reasonable probability of a different sentencing result if Busch had testified as a mitigation witness for Johnston, we combine the evidence that was not presented with the evidence that was presented at both stages of the trial. Then we reweigh the totality of the mitigating circumstances against the totality of the aggravating circumstances. See Williams v. Taylor, 529 U.S. 362, 397–98 (2000) (explaining that we must consider "the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding" and then "reweigh[] it against the evidence in aggravation"); see also Porter v. McCollum, 558 U.S. 30, 41 (2009). But there is another, important, aspect of the analysis.

In reweighing the aggravating and mitigating circumstance evidence to gauge prejudice, we must take into account any unfavorable evidence that could have come in if the additional mitigating evidence had been presented. See Wong

v. Belmontes, 558 U.S. 15, 20 (2009) (per curiam) (explaining that "it is necessary to consider all the relevant evidence that the jury would have had before it if [the petitioner] had pursued the different path — not just the mitigation evidence [the petitioner] could have presented, but also the [aggravating] evidence that almost certainly would have come in with it"); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1313 (11th Cir. 2016) (finding no prejudice because if the witness had testified at the penalty phase about the defendant's mental illness, "that testimony would have opened the door to a significant body of unfavorable and damaging evidence").  And when reweighing the circumstances, we focus on their weight, rather than their sheer number.  Boyd v. Allen, 592 F.3d 1274, 1302 n.7 (11th Cir. 2010).

For more than forty years it has been established Eighth Amendment law that a defendant convicted of a capital crime has the constitutional right to put before the jury as a mitigating circumstance "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  Lockett v. Ohio, 438 U.S. 586, 604 (1978).  But nothing in the Constitution requires juries to look in only one direction.  Just as the circumstances of the crime and the defendant's character may weigh in favor of a life sentence, they may also weigh in favor of a sentence of death.  The defendant's character can be shown in his criminal history, by the other crimes he

has committed.  Tuilaepa v. California, 512 U.S. 967, 972 (1994) (noting that a jury can consider "evidence of the character and record of the defendant" during the sentence stage); Simmons v. South Carolina, 512 U.S. 154, 163 (1994) (explaining that a defendant's "prior criminal history" is just one "of the many factors . . . that a jury may consider in fixing appropriate punishment").  That is why we have described what the jury heard about the brutal crimes Johnston committed against five other women before he murdered Coryell.  See Part II, above.

In making "an individualized determination" of whether a capital murderer should live or die, the circumstances of the crime are important.  Zant v. Stephens, 462 U.S. 862, 879 (1983); see also Proffitt v. Florida, 428 U.S. 242, 251 (1976) (upholding Florida's statute in part because the determination of sentence "requires the trial judge to focus on the circumstances of the crime and the character of the individual defendant").  That is why we have set out in detail how Johnston abducted, brutalized, and murdered Coryell, and the pain and suffering he inflicted on her.  See Part I, above; Payne v. Tennessee, 501 U.S. 808, 822 (1991) (rejecting the idea "that the defendant, entitled as he was to individualized consideration, was to receive that consideration wholly apart from the crime which he had committed").

A critical part of the circumstances of the crime is the amount of harm it caused. This is not a new concept. As the Supreme Court has explained, "the assessment of harm caused by the defendant as a result of the crime charged has understandably been an important concern of the criminal law, both in determining the elements of the offense and in determining the appropriate punishment." Id. at 819. It informs sentencing discretion. Id. at 820. A State may properly conclude, as Florida has, "that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." Id. at 825. The specific harm to the murder victim herself is, of course, the ultimate loss — the extinction of her life, the complete removal of self from everything she was and ever hoped to be, and the separation of her from everyone in this existence. That is not the only lasting harm a murderer inflicts on the innocent. The harm extends beyond the murder victim herself to the emotional suffering and loss inflicted on her family, her friends, and her community.

It is constitutionally permissible and appropriate for a jury to consider all of that harm when arriving at a proper sentence. See Jones v. United States, 527 U.S. 373, 395 (1999) ("[T]he Eighth Amendment . . . permits capital sentencing juries to consider evidence relating to the victim's personal characteristics and the emotional impact of the murder on the victim's family in deciding whether an

50

eligible defendant should receive a death sentence.") (plurality opinion). As the Supreme Court explained in its Payne decision, victim impact evidence is a good "form or method of informing the sentencing authority about the specific harm caused by the crime in question." 501 U.S. at 825. It shows "the loss to the victim's family and to society which resulted from the defendant's homicide," id. at 822, and it illustrates the "full reality of human suffering the defendant has produced." Booth v. Maryland, 482 U.S. 496, 520 (1987) (Scalia, J., dissenting).

Justice Souter, concurring in the Payne decision, explained it this way: "Murder has foreseeable consequences. When it happens, it is always to distinct individuals, and, after it happens, other victims are left behind." 501 U.S. at 838 (Souter, J., concurring). "Every defendant knows," he continued, "that the life he will take by his homicidal behavior is that of a unique person, like himself, and that the person to be killed probably has close associates, 'survivors,' who will suffer harms and deprivations from the victim's death." Id. It is therefore "morally both defensible and appropriate to consider such evidence when penalizing a murderer, like other criminals, in light of common knowledge and the moral responsibility that such knowledge entails." Id. at 839.

For whatever reason, prosecutors don't always put in victim impact evidence. But the ones in this case did. They introduced extensive evidence about LeAnne Coryell's character and about the survivors she left behind. Her father,

51

her employer, and her pastor all testified that LeAnne was a model parent, daughter, sibling, employee, coworker, and parishioner. They described her as "passionate," "intelligent," "social," "positive," "loving," and "warm." They recounted all that she had done for her little daughter Ansley and for others, and they recounted all that she was planning to do. For example, her pastor testified that just weeks before she was murdered, she had visited him to "discuss how she could get even more involved in the ministries of the church and how her life could be used in an even greater way to make a difference in this world." Her father and her employer told the jury what a bright future she had both in her personal and her professional life.

The testimony of LeAnne's father painted a heartbreaking picture about the pain her family had suffered and continues to suffer as a result of her horrific death. He told about how the death of his daughter devastated her family. About how he, his wife, and two sons "no longer hear the front door open with the greeting" from LeAnne and "the giggling" of Ansley. About how there are "[n]o more nightly phone calls to discuss the day[']s happenings." "No more visits" to her apartment. "No more family outings." "Just a missing void of one sixth of what was a close knit family."

Her father also told the jury about how LeAnne's six-year-old daughter, Ansley, was with him and his wife when the police came to his house with the

news that LeAnne had been murdered.  He described how difficult it was to tell a child that young she would never see her mother again.

LeAnne's father also recounted for the jury how her death has caused her one brother to become "an angry young man" and her other brother to withdraw from some of life's everyday experiences.  How it has caused her mother "to become an emotional basket case," and how it has caused him to become a "sarcastic and caustic old man long before [his] time."  He spelled out for the jury that he and his wife will have to suffer for "approximately twenty-five years," that LeAnne's brothers will have to suffer for "approximately fifty years," and that "little Ansley can expect to live with this loss of her mother about seventy-five years."  And "[t]hat's a long, long time.  In fact, it's a lifetime."  His final words to the jury were that his family's loss was "great — Ansley's loss even greater," and that he doubted "that any of the family will ever recover from the shock of that knock on the door in the early morning hours of August 20, 1997."  The murder of LeAnne left an awful hole in the lives of her brother, parents, six-year old daughter, church, and community.

Evidence about all of that loss was before the jury and weighed heavily in favor of a death sentence.  And there was more, of course.  The jury also heard the details of Johnston's brutal abduction, assault, and murder of LeAnne.  See Part I, above.  The jury heard about his attack on Judy Elkins and his rape of Susan

53

Reeder and his assault of Julia Maynard and his armed kidnapping of Carolyn Peak and his robbery and sexual assault of the Alabama store clerk.[7]  See Part II, above. And the jury heard everything Johnston had to say about those crimes when he took the stand at the sentence hearing, including his matter-of-fact confessions as well as his dismissals of his horrific attacks on one woman after another as "the same old thing, the same old story, same old action."  See pages 22–28, above. They heard Johnston refer dismissively to his abduction, robbery, and murder of LeAnne as "stupid stuff."  See page 25, above.  Not terrible, horrible, vicious crimes, but merely "stupid stuff."

To overcome the extensive and weighty aggravating circumstances in this case Johnston would have had to introduce equally powerful mitigating circumstances.  See Ray v. Ala. Dep't of Corr., 809 F.3d 1202, 1210–11 (11th Cir. 2016) (concluding petitioner could not show prejudice despite "profound and compelling" mitigating evidence because of the "heinous nature of the offense and prior convictions").  He did not.  During the sentence stage Johnston called four mental health experts, three family members, and five other character witnesses. See Part V.B, above.  He also testified himself.  See id.

---

[7] The jury did not hear any evidence about Johnston's brutal assault and murder of Janice Nugent six months before he brutally raped and murdered LeAnne.  He has since been convicted for murdering Nugent.  Johnston, 863 So. 2d 271.  If there were a future trial in this case the prosecution likely could present evidence about Johnston's murder of Nugent.

54

We know that the jury did not find Johnston's mitigating circumstance evidence compelling when compared to the facts of the crime, his violent criminal history, and other aggravating circumstances because they heard all of it and still unanimously sentenced him to death. The addition of the Diane Busch evidence would not have been strong enough to tip the scale in Johnston's favor. In fact, when all was said and done, it probably would have caused him more harm than good.

Had defense counsel called Diane Busch as a mitigation witness, the prosecutor would have had the opportunity to cross-examine her and call rebuttal witnesses. See Dawson v. Delaware, 503 U.S. 159, 167–68 (1992) (explaining that if a capital defendant introduces "good" character evidence, the State is entitled to introduce "bad" character evidence in rebuttal); Chandler v. United States, 218 F.3d 1305, 1321 (11th Cir. 2000) (explaining that calling character witnesses could be "counterproductive" because it "might provoke harmful cross-examination and rebuttal witnesses"). That would have allowed the prosecution to add more courses of damaging facts to the wall of aggravating evidence it had already built against Johnston.

If trial counsel had called Busch as a witness at the sentence stage, as petitioner insists he should have, the prosecutor could have cross-examined her regarding statements she had made about Johnston's behavior when she was

interviewed by Detective Taylor and again by Detective Willette while she was in the hospital.  According to the detectives' reports, she made a number of statements to them that were extremely unfavorable to Johnston and that contradicted the good things she would have had to say in her direct testimony about his good nature and character.  See pages 34–36, 39–41, above.

In the state post-conviction hearing, Busch testified that she did not recall either of the interviews happening, and when asked about each statement testified that she did not recall making it.  Under Florida law, if a witness "denies making or does not distinctly admit making the prior inconsistent statement, extrinsic evidence of such statement is admissible" for impeachment purposes.  Pearce v. State, 880 So. 2d 561, 570 (Fla. 2004).  If Busch had been called as a witness for Johnston at the sentence hearing and had testified on cross-examination that she did not recall making those derogatory statements about him, the detectives could have testified to her prior inconsistent statements.  Their testimony would have impeached her own testimony and undermined anything good that she had to say about Johnston.

In addition to destroying Busch's credibility by cross-examining her about her inconsistent prior statements, the prosecutor would have been able to bring out why Busch's family had made her cut all of her ties to Johnston.  She testified in the state post-conviction proceeding that her family had made her quit seeing him

56

because of his violent past.  The prosecutor would have presented the fact that

Busch identified Johnston to law enforcement after learning of LeAnne's murder.

And if Busch had testified at the sentence hearing about how kind Johnston had

been to her, the prosecutor surely would have asked Busch about her prior

statements to the detectives concerning her sexual encounter with Johnston, which

cast Johnston in an entirely negative light.  She testified in the state post-conviction

hearing that she did not recall those statements.  That would have opened the door

for the detectives to testify that Busch had told them that during sex Johnston

turned into a "mean character," called her a "bitch" and "fucking bitch," and was

"enamored or obsessed with the buttock area."  Which would have undermined

Busch's testimony and would have been devastatingly harmful to Johnston.

In addition to cross-examining Diane Busch, the prosecutor would have been

able to call as witnesses all of the people Detective Taylor interviewed concerning

Johnston's behavior while he was with Busch in the hospital.  The testimony of the

ICU nurses and Busch's mother and sister would have all corroborated the

negative statements that Busch made about Johnston to Detective Taylor.  They

could have testified, as they stated in their interviews with Detective Taylor, that

Johnston was controlling, that he would not abide by the hospital's rules, that he

threatened the nurses, and that he threatened Busch's parents and friends.

57

Even worse, the nurses also could have recounted to the jury that Johnston made sexual comments and advances toward Busch while she was lying in a hospital bed in the ICU, sick and heavily medicated. Nurse Davis could have testified, as she told Detective Taylor, that on one occasion she even found Johnston lying on top of Busch while Busch's medical alarms were going off, and that when the nurses tried to attend to Busch he would not allow them to do it. She could have testified that once when he was interfering with Busch's care she asked Johnston to leave and he refused and was abusive. She had to threaten to call security to force him to get out. And she could have testified, as Nurse Anderson would have, that the nurses asked security to escort them to their cars because of Johnston's abusive behavior and the threats that he made to them, to Busch's parents, and to Busch's friends.

Not only that, but if the defense had attempted to inject Johnston's "good deeds" toward Busch, her mother could have told the jury that Johnston started using her daughter's car like it was his own while she was in the hospital. And her mother also might have been permitted to recount how, after Johnston used her daughter's car, she found in the back seat a paper bag containing a pair of surgical gloves, an elastic wristband, and a knife. After all, the jury had heard from a number of other witnesses that Johnston had used a knife when attacking Judy Elkins, had used a knife when attacking Susan Reeder, had used a knife and

58

surgical gloves when attacking Julia Maynard, and had used a knife and surgical gloves when attacking Carolyn Peak. See Part II, above.

And Busch's sister could have testified that Johnston not only did not have the family's permission to use Busch's car, as he had been doing, but he also was so enraged when they asked for him to give it back that he threw the keys at her parents, even as they were attending to their daughter in the ICU.

It is no wonder Johnston's sentence stage attorney, after hearing all of that evidence come out during the state post-conviction proceedings, stated: "The testimony from this woman would have been bad, . . . very bad, based on what's in [Detective Taylor's] report." He was emphatic that if he had investigated using Busch as a witness, he wouldn't have called her. He recognized that the net effect of putting Diane Busch on the stand at the sentence stage would have made a bad situation even worse for Johnston. It would have opened more doors leading to a death sentence.

Any favorable testimony that Diane Busch might have given if she had been called as a witness was open to impeachment with her prior statements to detectives, as we have already discussed. Not only that, but as the Supreme Court said in another case, it "would have triggered admission of . . . powerful . . . evidence in rebuttal," which "would have made a difference, but in the wrong direction." Wong, 558 U.S. at 22. And what we have held in another case fits here

59

as well: "Prejudice is also not established when the evidence offered in mitigation is not clearly mitigating or would open the door to powerful rebuttal evidence." Ledford v. Warden, GDCP, 818 F.3d 600, 649 (11th Cir. 2016). Busch's testimony would have opened the door to a lot of evidence harmful to Johnston instead of altering the sentencing balance in favor of him.

The brutal details of Johnston's abduction, beating, and murder of LeAnne, the lifelong pattern of his violent attacks against other women, and the victim impact evidence about the devastating loss suffered by the family members and friends LeAnne left behind still weigh overwhelmingly in favor of a death sentence. See Krawczuk v. Sec'y, Fla. Dep't of Corr., 873 F.3d 1273, 1297 (11th Cir. 2017) (concluding that there was no reasonable probability of a different result given the "substantial weight due to aggravation").

## VIII. CONCLUSION

Because Johnston has not shown that his counsel's failure to investigate and call Diane Busch as a witness prejudiced his defense at either the guilt or sentence stage, we affirm the district court's denial of his ineffective assistance claims.

AFFIRMED.

MARTIN, Circuit Judge, concurring in the result:

I agree with the majority's decision to affirm the District Court's dismissal of Mr. Johnston's ineffective assistance of counsel claim. Mr. Johnston failed to show he suffered prejudice from the exclusion of Ms. Busch's testimony in both the guilt phase and penalty phases of his trial.